## UNITED STATES of America

v.

## Bobby A. LLOYD, Appellant.

### No. 88–3038.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1988.

Decided Feb. 28, 1989.

Sol Rosen, Washington, D.C. (appointed by the court), for appellant.

Gregory E. Jackson, Asst. U.S. Atty., of the bar of the District of Columbia, pro hac vice, by special leave of court, with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell and Theodore A. Shmanda, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MIKVA, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Bobby Lloyd appeals his convictions for possession of cocaine and for failure to appear for his preliminary hearing. Lloyd argues that his drug-related conviction was based on evidence obtained by police during an unlawful search and seizure at Union Station in Washington, D.C. At a pretrial hearing, the district court denied Lloyd's motion to suppress this evidence. We conclude that the court's ruling rested on a correct application of Fourth Amendment law: No "seizure" of Lloyd ever occurred, and the search was lawful because Lloyd freely consented to it. As the district court correctly denied Lloyd's motion to suppress, we affirm his conviction for drug possession based on that evidence. We also affirm Lloyd's conviction for failure to appear at his hearing because sufficient evidence supports the jury's verdict on that count.

## I. BACKGROUND

On December 3, 1987, the United States District Court for the District of Columbia (Gesell, J.) denied defendant/appellant Bobby Lloyd's motion to suppress evidence obtained by Detectives John Centrella and Edward Curley, of the Metropolitan Police Department of Washington, D.C., during the questioning and arrest of Lloyd and Wayne Howell. *United States v. Lloyd,* Crim. Action No. 87–0436–01 (D.D.C. Dec. 3, 1987).

At the suppression hearing, Centrella and Curley testified as follows. While on duty at Union Station on the morning of

October 1, 1987, they observed Lloyd and Howell depart from a train that had just arrived from New York, walk to the center of the concourse, stop and look around, then return to a seating area. The police officers' suspicions were aroused because defendants had been on a "Night Owl" train from New York and were acting in an unusual manner. After lounging for about twenty minutes, Lloyd picked up the bag he had carried off the train and left the station with Howell; the detectives followed discreetly.

While Lloyd and Howell were waiting outside in the taxi line, Centrella approached Lloyd; Curley remained several feet away. Both detectives were dressed in plain clothes and had their guns concealed. In a normal conversational tone, Centrella identified himself as a policeman, said he would like to talk, and asked Lloyd and Howell if they had arrived on the train from New York. Although both men answered that they had come from New York, neither could produce his ticket. Lloyd told Centrella that he lived in New York, but when Centrella requested identification, Lloyd produced a photo i.d. card bearing the name "Rodney Stewart" with a Washington, D.C. address. When asked his purpose in traveling to Washington, Lloyd responded that he was visiting friends, but could not identify them. By this point, the conversation had lasted about three or four minutes.

Centrella then told Lloyd that he was working for the drug interdiction program and asked permission to look in the bag Lloyd was carrying. Lloyd replied "sure," opened the bag, and removed some clothing. Centrella again requested permission to search the bag; Lloyd answered "go ahead." Lloyd testified that the bag belonged to Howell and that he had no knowledge of its contents.

While Centrella was searching the bag and discovering 173 vials of crack cocaine, Lloyd walked away. Curley did not move or speak. Lloyd then voluntarily returned to Centrella, at which time he and Howell were arrested and given *Miranda* warnings. Lloyd was taken to police head-quarters, where he was again advised of his rights and signed a card indicating that he understood his rights. According to Centrella, Lloyd admitted that this was the third time he had traveled to Washington with cocaine for a man identified only as "Garry."

This testimony was essentially uncontested, although Lloyd disagreed with certain of the details. For example, while he admitted signing the card at police head-quarters, he denied that he had answered "Yes" to each of the questions. Also, he claimed it was Howell, not he, who had stated this was his third trip carrying cocaine for Garry.

After considering the testimony, Judge Gesell denied the motion to suppress, which was based on Fourth Amendment claims. He determined that "there were grounds for the police to have reasonable suspicion under the circumstances given the time of day, [and] the conduct of the two individuals arrested, to justify a *Terry* type stop" (referring to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The court found that there was no search or detention, noting that Lloyd "knew he could walk away because he did walk away." The court further concluded that "the fact that [Lloyd] did not understand that there [were] any drugs in the bag and that the bag didn't belong to him demonstrates ... that the consent given to examine the contents of the bag was freely and openly given because the man in his own testimony sa[id] he had nothing to conceal." Finally, Judge Gesell noted that Lloyd had signed the card containing the *Miranda* warnings and deferred until trial the question whether it was Lloyd or Howell who had admitted being a drug courier.

A jury trial commenced January 28, 1988. Centrella and Curley essentially repeated their earlier testimony. They added that during the period in question, Lloyd had retained possession of the bag, and that upon being released from custody, Lloyd signed the police property book acknowledging receipt of the bag. Lloyd reiterated that the bag was Howell's and that he did not know its contents, but admitted

he had smoked crack before boarding the train. He denied previously selling drugs or telling Centrella that this was his third trip to Washington and that his contact was Garry. Centrella, however, reaffirmed that Lloyd had made these statements. Based on their evaluation of the testimony regarding the Union Station encounter and the drugs seized at the scene, the jury found Lloyd guilty of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841 (1982 & Supp.1986) and 18 U.S.C. § 2 (1982).

To support the charge of failure to appear for a hearing, the government introduced Lloyd's signed release order dated October 1, 1987, giving him notice to return to court for a preliminary hearing on October 5, 1987, and a copy of the court record showing that Lloyd had failed to appear. Lloyd testified that after returning to New York, he resumed using crack, did not receive notice from Pretrial Services and thus did not know when to come to court, and could not afford the fare to Washington. Lloyd admitted, however, that upon his release he had been given a blue sheet of paper containing the hearing information, that he had failed to report for drug testing as required by the release, had not kept in contact with his lawyer, and did not appear for his hearing because of his drug abuse. The jury found that Lloyd had failed to appear for his hearing in violation of 18 U.S.C. § 3146 (1982 & Supp.1986).

Lloyd has appealed his convictions on both counts.

## II. DISCUSSION

The district court's denial of Lloyd's motion to suppress was amply supported and was based on a proper application of Fourth Amendment principles. We will consider the "seizure" and "search" issues in turn.

### A. Was There a Fourth Amendment "Seizure"?

■ Lloyd argues that the evidence obtained on October 1, 1987 should have been suppressed because it was obtained after a "seizure" that violated the Fourth Amendment. We conclude, on the contrary, that the encounter between the police officers and Lloyd did not amount to a "seizure," as that term has been defined by the Supreme Court over the past two decades.

In *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), the Court declared that the central Fourth Amendment inquiry is "the reasonableness in all the circumstances" of the government official's conduct. The Court ruled that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. This discussion in *Terry* has evolved into a test: A seizure has taken place " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (*quoting United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). This test enables a court to assess the coercive effect of police action, and its objective standard allows police to determine whether the conduct they are contemplating will implicate the Fourth Amendment. 108 S.Ct. at 1979–80.

We recently summarized these familiar principles by declaring that a "seizure" requires that "a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence," considering factors such as visibility of weapons, physical intimidation, threats, or an unusual setting or time. *United States v. Brady,* 842 F.2d 1313, 1314 (D.C.Cir.1988). *See also Chesternut,* 108 S.Ct. at 1980–81 (police conduct involving no aggressive action, display of weapons, authoritarian commands, or blockage of defendant's passage would not have communicated to a reasonable person an attempt to impede his movement, and was therefore not a seizure). We noted that the two detectives in *Brady* "were in plain clothes, they were courteous; and at each point in the discussion, movement

and search, they requested permission from Brady before acting." *Id.*

As in *Chesternut* and *Brady*, a reasonable man in Lloyd's position would not have concluded that his liberty was being involuntary restricted. Officer Centrella approached Lloyd alone (Curley remained several feet away) and politely asked him a series of questions, both detectives dressed in plain clothes and displayed no aggressiveness (e.g., neither made threats nor brandished weapons), and the encounter occurred outdoors. Indeed, even if the test were subjective, the fact that Lloyd walked away while Centrella searched his bag indicates that Lloyd felt free to leave. Notwithstanding Lloyd's contrary assertions, an officer's request for travel tickets, identification, or other information does not become a "seizure" merely because the officer does not tell the person that he may refuse to answer the questions and is free to leave. *See, e.g., United States v. Castellanos,* 731 F.2d 979, 983–84 (D.C.Cir.1984). *See also Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (mere approach by law enforcement officers, identified as such, does not constitute a seizure).

In sum, we conclude that Lloyd was not subjected to a Fourth Amendment seizure. Because no seizure occurred, the police were not required to have "a particularized and objective basis for suspecting the defendant of criminal activity" before approaching him, and we need not address this distinct "reasonable suspicion" issue, which Lloyd had raised and the district court reached and resolved in the government's favor. *See Chesternut,* 108 S.Ct. at 1981, citing *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981).

**B. Was There an Unconstitutional Search?**

■ Because the district court's ruling on the consent issue was predicated on factual findings, we may reverse only if we conclude that its decision was clearly erroneous. *See United States v. Sheard,* 473 F.2d 139, 146 (D.C.Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973). We hold that the trial court did not err in finding that Lloyd voluntarily consented to the search.

To determine whether consent is voluntary, a court must apply a "totality of all the surrounding circumstances" test, considering factors such as the accused's age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Lloyd asserts that the officer's failure to advise a defendant of his right to refuse the search is the "critical factor," and he emphasizes his youth (18 years old) and poor education. The Supreme Court, however, has deemed no single factor dispositive and leaves the trial court discretion to weigh these factors in light of the facts of each case—a task that Judge Gesell conscientiously performed here. *See* 412 U.S. at 226–27, 93 S.Ct. at 2047–48; *see also id.* at 227, 93 S.Ct. at 2047–48 (government need not establish defendant's knowledge of his right to refuse consent in order for it to be effective).

Lloyd argues that he did not voluntarily consent to the search of the bag; rather, he submitted to the police because he feared their authority. We reject this contention. The Union Station encounter was not marked by "aggressive questioning, intimidating actions, or prolonged police presence"; Lloyd was not forcibly detained or physically abused. *Brady,* 842 F.2d at 1315, citing *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59. Moreover, Lloyd immediately consented to both of Centrella's search requests, responding "sure" and "go ahead." *See Brady,* 842 F.2d at 1315 (defendant clearly consented by saying "go ahead" when detectives asked to search his bag). As Judge Gesell noted, Lloyd testified that he agreed to the search because the bag belonged to Howell and he did not know it contained drugs. Unless Lloyd committed perjury, by his own admission he had nothing to hide and gave his con-

sent freely. Thus, the court correctly concluded that Lloyd voluntarily consented to the search, and the conviction should be affirmed because the drugs were properly admitted as evidence at trial.

Because the detectives' actions did not amount to an unlawful search and seizure, the court was also correct in refusing to suppress the statements made by Lloyd after he had been arrested and given *Miranda* warnings.

## C. Failure To Appear For Hearing

■ This issue merits little discussion. It is not seriously disputed that on October 1, 1987, Lloyd received notice of the date, time, and place of his preliminary hearing, that he signed this notice, and that he failed to appear for the hearing as required. Lloyd argues, however, that because the evidence failed to demonstrate that his non-appearance was "willful," he should not have been convicted on this count. He claims that after his release, he returned to New York, used crack, and simply forgot about the hearing, as opposed to deliberately failing to appear. Lloyd's drug use, however, did not affect his ability to travel; indeed, he testified that on the day of his arrest he had smoked crack before traveling from New York to Washington. In short, the jury could reasonably have concluded that Lloyd willfully failed to appear even though he knew he had a duty to do so.

### III. CONCLUSION

The district court's denial of Lloyd's motion to suppress the evidence obtained in the Union Station encounter was based on a correct interpretation and application of Fourth Amendment law. As the statements made and drugs confiscated were properly admitted as evidence, Lloyd's conviction for drug possession must be affirmed, as must his conviction for failure to appear.

SO ORDERED.