**UNITED STATES of America**

v.

**John WINSTON.**

**Crim. No. 89–0070–LFO.**

United States District Court,
District of Columbia.

April 25, 1989.

Charles M. Steele, Asst. U.S. Atty., Washington, D.C., for U.S.

Michael J. McCarthy, Bowie, for defendant.

MEMORANDUM

OBERDORFER, District Judge.

### I.

Defendant John Winston, charged with unlawful possession with intent to distribute 50 grams or more of cocaine, has filed a motion "to suppress as evidence against him all physical evidence seized from him or from a totebag, allegedly in his possession" and "any post-arrest statements made to police." A hearing was held on April 7, 1989, at which Detective Vance Beard and Special Agent Angelo Sorrento were the only witnesses.

The hearing developed the following facts: During the early morning hours of February 13, 1989, a Drug Interdiction Unit, consisting of Sergeant Brennan, Detective Beard, Agent Sorrento, and one other officer, was deployed on assignment at the Greyhound–Trailways bus station at 1005 1st Street, N.E. When bus # 1693 arrived from New York City at approximately 1 a.m., a group of passengers, including defendant, disembarked and walked into the station. The four officers observed a passenger, *not* defendant, whom they decided to question, and they followed that suspect out of the L Street exit. Detective Beard testified that defendant "could have seen us leaving," and began to walk slower. The officers, including Beard, passed defendant as they walked out.

When they had cleared the door to the station, Sergeant Brennan suggested to Detective Beard that defendant "would be a good guy to interview." Brennan then began to conduct an interview of the original suspect, and Beard made eye contact with defendant. Defendant was standing in front of a parked car, watching the officers question the suspect. He was approximately 100–150 yards away from them. Beard "had nothing else to do" and he approached defendant, confronted him, and engaged him in conversation. Neither Brennan nor Beard ever articulated *any* reason, either in court or out, for following, approaching, confronting, and beginning any conversation with defendant. Beard

testified that he "would not have picked out defendant as my first choice to interview," and that he "didn't see a lot about that guy that aroused my suspicions."

Beard identified himself to defendant as a police officer, and asked permission to talk with him; defendant said "yes." Beard asked if he had his bus ticket; defendant said that he did and he showed the ticket to Beard. The detective and defendant had a brief conversation, in which defendant said that he was in Washington to visit a girlfriend, but he could not tell the detective her address because she moved around a lot. While Beard talked with defendant, Agent Sorrento left Sergeant Brennan and the other officer in order to serve as "back-up" for Beard. He positioned himself approximately 6–8 feet behind defendant so that he could hear the conversation. Beard then explained to defendant that he was in the Narcotics Branch of the police department and that his job was to interview people coming into D.C. to try to stop the flow of drugs into the city. Beard added that New York was a source city for crack. Beard asked defendant if he was carrying any drugs; defendant said he was not. Beard then asked if he could search his bag; defendant said he didn't mind because he didn't have anything to do with drugs. He also said that it wasn't his bag, but that someone had asked him to carry it off the bus. Beard searched the bag, found a white t-shirt, and found wrapped inside it 537 zip-lock bags of crack, as well as some marijuana. Beard then asked defendant "do you have a cigarette?", which was a code phrase for Sorrento, who then "reached and grabbed defendant's left wrist and handcuffed him." Beard advised defendant of his rights, defendant signed the rights card, and repeated his statement that the bag wasn't his.

Judicial notice can be taken of the fact that in October of 1987 the Metropolitan Police Department formed a Drug Interdiction Unit, from which it deploys squads of officers on assignment at the bus and train stations in Washington to observe, confront, question, detain, search, and arrest

people whom they initially identify as suspicious. These officers have developed a routine whereby they (1) identify a suspicious individual by noting a combination of characteristics about the person, his appearance, and his actions which lead them reasonably to suspect that the individual may be involved in criminal activity; (2) encounter [1] the suspect, one as questioner, one or more positioning themselves as back-up; (3) commence a series of questions leading up to a request to search the suspect's belongings if the officer's suspicions continue, or to a cessation of questioning if his suspicions are allayed; and (4) arrest the suspect if the officer finds drugs, or cease contact if no drugs are uncovered. An officer's use of this prescribed routine on an individual is triggered by a police judgment, which is informed by observation, experience and expertise. At issue in this case is the judgment made to encounter the defendant and thereby trigger the routine, or, in the alternative, the entire process initiated by that judgment, culminating in the search and formal arrest of defendant.

## II.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where an officer observed three men who appeared to be "casing" a store for a robbery and then approached them for questioning and frisked them, the Supreme Court identified "the initiation of police action" as conduct that implicates constitutional scrutiny. The Court stated:

> There is some suggestion in the use of such terms as "stop" and "frisk" that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a "search" or "seizure" within the meaning of the Constitution. *We emphatically reject this notion.*

*Id.* at 16, 88 S.Ct. at 1877 (emphasis added). The Court continued:

> The danger in the logic which proceeds upon distinctions between a "stop" and an "arrest," or "seizure" of the person

... is twofold. It seeks to isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen. And by suggesting a rigid all-or-nothing model of justification and regulation under the Amendment, it obscures the *utility of limitations upon* the scope, as well as *the initiation,* of police action as a means of constitutional regulation.

*Id.* at 17, 88 S.Ct. at 1877–78 (emphasis added). In *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), Drug Enforcement Administration agents stopped a defendant upon his arrival at the Honolulu International Airport, knowing, *inter alia,* that (1) he paid $2,100 for two airline tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a roundtrip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. There, the Supreme Court again focused on the initiation of police-citizen contact. Relying on its decision in *Terry,* the Court stated:

> Our decision ... turns on whether the agents had a *reasonable suspicion* that respondent was engaged in wrongdoing *when they encountered him* on the sidewalk.

*Id.* at ——, 109 S.Ct. at 1585 (emphasis added). *See also United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (initial stop by Border Patrol officers must be supported by particularized suspicion that individual being stopped is engaged in wrongdoing). *Terry* establishes, and *Sokolow* reaffirms, that the police may set in motion their apparatus for confronting and questioning an individual only if they have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *Sokolow,* —— U.S. at ——, 109 S.Ct. at 1585; *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884.

---

**1.** *See United States v. Sokolow, infra* p. 641.

Although *Terry* warns against isolating from constitutional scrutiny "the initial stages of contact" between the police and the citizen, and *Sokolow* focuses on the predicates required for the initiation of police-citizen encounters, much of the litigation in the area of Fourth Amendment challenges to police action has nevertheless focused on the *scope,* not the *initiation,* of police action. The first question in this case, however, is what is required for police to make an *initial encounter* with a view to applying to a person the standard drug interdiction scenario. Therefore, *United States v. Brady,* 842 F.2d 1313 (D.C.Cir.1988), and *United States v. Lloyd,* 868 F.2d 447 (D.C.Cir.1989), the two cases relied on by the government, and also cases which focus on the scope, rather than the initiation of police action, are of little assistance here. In fact in *Brady,* the police sought out the defendant because, (as they testified at the suppression hearing), a general description of him, available to the agents before his train arrived in Washington, including information that defendant was the sole occupant of a roomette, was travelling on a one-way ticket purchased with cash, and had a prior conviction for narcotics distribution, had made the police suspicious of him. In *Lloyd,* the police observed defendant and another man "acting in an unusual manner," and they so testified at the suppression hearing. In light of these aspects of *Terry, Sokolow, Brady* and *Lloyd,* it is unlikely that a police officer on a drug interdiction reconnaissance has the authority to approach and question any citizen about whether he is involved with drugs and ask to search his belongings, while another officer stands ready to seize the person on signal, without some measure of reasonable, articulable suspicion about that person, such as preceded the police action in *Terry, Sokolow, Brady* and *Lloyd.* The initial encounter itself and the triggering of the Drug Interdiction Unit's routine must be supported by some minimal level of suspicion.

Accordingly, it is necessary to evaluate the information related by the witnesses as the justification for the encounter here. Agent Sorrento testified that he did not see defendant inside the station, did not take any action to approach defendant, and did not talk with Beard about defendant. Sorrento positioned himself as back-up only because he noticed that Beard was approaching defendant to conduct an interview. Detective Beard testified that he approached defendant only because "Sergeant Brennan said [defendant] would be a good guy to interview." There was no testimony or other evidence as to why Sergeant Brennan thought Beard should interview defendant. In fact, Brennan was conspicuously absent from the hearing. Beard himself testified with commendable candor that he "didn't see a lot about that guy that aroused my suspicions." Apart from defendant's presence in the bus station en route from New York, Beard articulated nothing to distinguish defendant from any other mature, 35 year old black man walking through the station.[2] The bare fact that defendant paused outside to watch a group of people talking and made eye contact with Detective Beard does not justify the encounter effected here. Since there is no evidence as to what, if anything, Sergeant Brennan found suspicious about defendant, and Beard affirmatively stated that he did not suspect defendant, the government has failed to establish the bare modicum of a rationale for the judgment that Beard should encounter defendant and thereby trigger the routine.

In any event, the Supreme Court has directed that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account 'all the circumstances surrounding the incident' in each individual case." *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). Even if the original encounter were not the critical event, it is part of the total context of the police action

**2.** According to a Pretrial Services Agency report, defendant is 35 years old.

that culminated in the formal arrest of defendant. In addition to the defective encounter, it is apparent here that Beard's questioning of defendant turned into an investigative stop and a detention when the Detective identified himself as a member of the Narcotics Branch whose purpose it was to stop drugs from coming into Washington, stood in front of defendant with Agent Sorrento positioned behind defendant, and asked to search defendant's bag. A reasonable person would have sensed the momentum of the questioning and maneuvers of the officers, and would have felt the *in terrorem* effect of Detective Beard's identification of himself as a narcotics officer and his request to search the bag *after* defendant had denied possession of drugs. Unlike the scenario in *Lloyd*, where the defendant walked away from the officer who was searching his bag and then voluntarily walked back, defendant in this case remained in the same spot from the moment he was encountered until the routine culminated in the search and the arrest. Accordingly, the government has failed to carry its burden of persuasion that the defendant agreed to the search of his bag before he could reasonably conclude that he was no longer free to leave. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968)).

■ The government argues in the alternative that defendant disclaimed ownership of the bag by claiming that it was not his, and he therefore has no privacy interest in it. As support, the government refers to *United States v. Brady, supra,* where the Court of Appeals held that the defendant was not "detained," and, although not reaching the District Court's ruling on the question of abandonment, expressed "serious doubts as to its validity." *Brady,* 842 F.2d at 1315–16. The District Court concluded that the defendant's express disclaimer of ownership of a gym bag found by the police in his train compartment did not amount to abandonment, and therefore could not legally result in surrender of his privacy expectation in the property. The Court of Appeals, however, found that the defendant's disassociation was "absolute," there being no evidence that qualified in any way his intent to abandon the bag. In this case, however, because Detective Beard initiated the encounter without any reasonable, articulable suspicion about this defendant, and because defendant's disclaimers of ownership of the bag occurred after and were precipitated by the illegal encounter, the issue of abandonment of the bag need not be reached. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also United States v. Tolbert,* 692 F.2d 1041, 1045 (6th Cir.1982); *United States v. Morin,* 665 F.2d 765, 770 (5th Cir.1982).

The current drug problem in Washington is indeed a serious one, deserving of the attention of our entire community and of increased investigation and interdiction by police. The magnitude and seriousness of this crisis, however, must not undermine constitutional protections. Because it is individuals who are actually found with drugs who challenge in suppression hearings in the District Court the use of the interdiction apparatus employed here, it may be easy to forget that constitutional limitations on police action protect all citizens, innocent and guilty. All citizens have the right "to be secure in their persons," U.S. Const. amend. IV, as they travel through public areas on route from one city to another. In this case, no one has articulated any reason to justify the police-citizen encounter here. The officers set their routine in motion, but have offered no justification for the triggering police judgment. To expose every person to being encountered, questioned, and threatened with search for no articulable reason would be too high a price to pay for the marginal effect of such a practice on our drug crisis.

Accordingly, an accompanying order will grant defendant's motion to suppress the introduction into evidence of all physical evidence taken from the t-shirt found by Detective Beard in the bag and defendant's statements to the effect that the bag was not his.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 25th day of April, 1989, hereby

ORDERED: that defendant's motion to suppress physical evidence and statements should be, and is hereby, GRANTED.