UNITED STATES of America,
Appellant,

v.

John WINSTON.

No. 89–3087.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 12, 1989.

Decided Dec. 22, 1989.

---

Charles M. Steele, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellant.

Peter Buscemi, Washington, D.C., appointed by this court as amicus curiae, urging affirmance.

Before BUCKLEY, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The United States appeals from a district court order granting appellee John Winston's motion to suppress cocaine seized from his totebag during his questioning and arrest by Drug Interdiction Unit officers at a bus station in Washington, D.C. Because we conclude that the questioning of Winston was not a "seizure" within the meaning of the Fourth Amendment and that he voluntarily consented to the search of his bag, we reverse.

## I. BACKGROUND

On March 14, 1989, John Winston was indicted on one count of possession with intent to distribute fifty grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(A)(iii) (1982 & Supp. IV 1986).

On March 31, Winston filed a motion to suppress all physical evidence seized by the police at the time of his arrest as well as his post-arrest statements. At the suppression hearing, the government presented two witnesses—Detective Vance Beard, of the Metropolitan Police Department's Drug Interdiction Unit, and Special Agent Angelo Sorrento, of the Immigration and Naturalization Service. Their testimony was uncontested.

At approximately 1:00 a.m. on February 13, 1989, Detective Beard, Special Agent Sorrento, and several other members of the Drug Interdiction Unit were on plainclothes duty at the Greyhound–Trailways bus station in northeast Washington. Winston was among the passengers who arrived on a bus from New York City and entered the station. Beard noticed that Winston walked through the station at a very slow pace and looked around as if he were searching for someone.

As Winston was leaving the station, Beard, Sorrento, and two other Interdiction Unit officers spotted a passenger whom they wanted to interview and followed him out of the station, passing Winston along the way. As they cleared the doors, one of the officers, Sergeant Brennan, suggested to Beard that Winston "would be a good guy to interview." Suppression Hearing Tr. at 25 (Apr. 7, 1989). Brennan and another officer then proceeded across the street from the station to interview the original suspect, while Beard and Sorrento dropped back.

Meanwhile, Winston had left the station and stopped in front of a parked car; Beard observed him watch the officers interview the suspect. Winston, who was then about eight feet from Beard, turned toward Beard, made eye contact, turned back around, and then faced Beard again.

At that point, Beard decided to interview Winston. Beard testified that he had seen little or nothing about Winston that aroused his suspicions, other than the fact that he had been walking slowly. Moreover, Beard admitted that he would not have picked out Winston as his "first choice" to interview had it not been for

Brennan's suggestion. *Id.* at 26. Beard also admitted that he had nothing else to do, and that his decision to interview Winston was prompted by Brennan's suggestion and the eye contact with Winston. There is no explanation in the record of why Brennan had made his suggestion, and he did not testify at the hearing.

Whatever the reasons, Beard approached Winston, displayed his identification folder, identified himself as a police officer, and asked whether he could speak with him. Winston replied that he could. Special Agent Sorrento acted as a back-up to Beard and positioned himself about six to eight feet away from Winston. The testimony of Beard and Sorrento was conflicting as to whether Sorrento was behind Winston or to his side. Both Beard and Sorrento were in plain clothes, with their weapons concealed.

Beard asked Winston whether he had just arrived on a bus and whether he still had his ticket. Winston responded that he had and showed his ticket which confirmed that he had arrived from New York. After examining the ticket, Beard returned it to Winston and asked him why he was visiting Washington. Winston answered that he had come to see his girlfriend.

Beard then explained that he was from the Narcotics Branch of the police department and that it was his job to interview people entering Washington "in an attempt to stop the drugs as they were coming in and before they had a chance to reach the streets and get the young kids hooked on drugs." *Id.* at 11. In addition, Beard said that he interviewed people coming from New York because New York was a source city for crack cocaine, and Winston said that he understood.

Beard proceeded to ask Winston whether he had any drugs in the totebag he was carrying, and Winston answered no. Beard asked him whether he would mind if Beard searched the bag, to which Winston replied, "No, I don't mind, because I don't have anything to do with drugs." *Id.* Beard then searched the bag and found 537 individual packets of crack. Beard gave Agent Sorrento a code word, and Sorrento moved in and arrested Winston.

Throughout the encounter, Beard used a polite and conversational tone of voice. He made no physical contact with Winston, nor did Sorrento prior to the arrest. Before the arrest, Winston was "very" cooperative and did not ask to leave.

On April 25, 1989, the United States District Court for the District of Columbia issued a memorandum and order granting the motion to suppress. *United States v. Winston*, 711 F.Supp. 639 (D.D.C.1989). The court noted that members of the Drug Interdiction Unit had

> developed a routine whereby they (1) identify a suspicious individual by noting a combination of characteristics ... which lead them reasonably to suspect that the individual may be involved in criminal activity; (2) encounter the suspect, one as questioner, one or more positioning themselves as back-up; (3) commence a series of questions leading up to a request to search the suspect's belongings if the officer's suspicions continue ...; and (4) arrest the suspect if the officer finds drugs.

*Id.* at 641 (footnote omitted). The court then declared that

> [a]t issue in this case is the judgment made to encounter the defendant and thereby trigger the routine, or, in the alternative, the entire process initiated by that judgment, culminating in the search and formal arrest of the defendant.

*Id.*

The court first addressed the question of "what is required for police to make an *initial encounter* with a view to applying to a person the standard drug interdiction scenario" described above. *Id.* at 642 (emphasis in original). Relying on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the court asserted that "police may set in motion their apparatus for confronting and questioning an individual *only* if they have reasonable suspicion supported by articulable facts that criminal activity

may be afoot," *Winston*, 711 F.Supp. at 641 (internal quotations omitted) (emphasis added), and concluded that the "initial encounter itself and the triggering of the Drug Interdiction Unit's routine must be supported by some minimal level of suspicion." *Id.* at 642. Finding that "no one has articulated any reason to justify the police-citizen encounter here," the court held that there had been a "defective encounter." *Id.* at 643.

In addressing the alternative question (whether the "entire process" had resulted in a seizure), the district court noted that "[e]ven if the original encounter were not the critical event, it is part of the total context of the police action that culminated in the formal arrest of defendant." *Id.* at 642–43. The court found that the encounter with Winston had become an unjustified investigative stop and detention when Beard identified himself as a police officer engaged in the interdiction of drugs and asked to search the bag, because a reasonable person "would have sensed the momentum of the questioning and the maneuvers of the officers" and "felt the *in terrorem* effect" of Beard's "request to search the bag *after* defendant had denied possession of drugs." *Id.* at 643 (emphasis in original). Accordingly, the court held that "the government [had] failed to carry its burden of persuasion that the defendant agreed to the search of his bag before he could reasonably conclude that he was no longer free to leave." *Id.*

## II. DISCUSSION

The district court based its order on two grounds. First, the encounter initiating the questioning of Winston was unauthorized because it was unsupported by at least "some measure of reasonable, articulable suspicion." *Id.* at 642. (Although the court nowhere characterizes the initial encounter as a violation of Winston's Fourth Amendment rights, that is the burden of its opinion.) Second, even if the initial encounter were not a seizure, it clearly became one at some point during the questioning, thereby invalidating his consent. For purposes of discussion, we assume without

deciding that the district court correctly concluded that Beard had *no* articulable suspicion about Winston prior to their encounter.

We begin our analysis with *Terry v. Ohio*. In that case, the Supreme Court noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. In 1980, Justice Stewart articulated what has become the Supreme Court's test for determining whether a seizure has taken place: "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). *See, e.g., Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). Two years later, in combining the standards set forth in *Terry* and *Mendenhall*, we noted that "the ultimate issue ... [is] whether [the police officer's] conduct constitutes a *show of authority* that would lead a reasonable person to conclude that he is not free to go." *Gomez v. Turner*, 672 F.2d 134, 141 (D.C.Cir.1982) (emphasis in original). The rule, as it has been refined and is now applied by this court, holds that a seizure takes place when "a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence." *United States v. Brady*, 842 F.2d 1313, 1314 (D.C.Cir.1988); *see also United States v. Lloyd*, 868 F.2d 447, 450 (D.C.Cir.1989). The circumstances we consider relevant include such factors as "visibility of weapons, physical intimidation, threats, or an unusual setting or time." *Lloyd*, 868 F.2d at 450.

This test establishes an objective standard that "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment."

*Chesternut,* 108 S.Ct. at 1980; *see also Lloyd,* 868 F.2d at 450. Therefore, the subjective beliefs of the person approached are irrelevant to whether a seizure has occurred. *United States v. Carrasquillo,* 877 F.2d 73, 76 (D.C.Cir.1989). Furthermore, as the test is predicated on a "reasonable person" who is "innocent of any crime," *United States v. Savage,* 889 F.2d 1113, 1116 (D.C.Cir.1989), law enforcement officers are not expected to tailor their conduct to a "guilty mind, which is especially prone to apprehensions of confinement." *Brady,* 842 F.2d at 1315 n. 3.

The test recognizes that in some police-citizen encounters, a person's awareness of the duties of police officers to apprehend criminals, keep the peace, and prevent crime, "coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate with law enforcement officers.... Accordingly, the presence of [an] officer as a figure of governmental authority does not, by itself, constitute the 'show of authority' necessary to make a reasonable person feel unfree to leave." *Gomez,* 672 F.2d at 141–42 (footnotes omitted); *see also Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966) ("It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement."). Thus, "to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer," *Gomez,* 672 F.2d at 142, it must be demonstrated that the officer's show of authority, in combination with other circumstances, is objectively "so intimidating that [an individual] could reasonably have believed that he was not free to disregard the police presence and go about his business." *Chesternut,* 108 S.Ct. at 1981 (internal quotations omitted).

In the case before us, the district court relied on language from *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), for its conclusion that Beard's initial encounter with Winston had to be supported by some measure of suspicion. *Winston,* 711 F.Supp. at 641–42. The language relied upon appears in the last sentence (which we print in italics) of the following passage:

> The Court of Appeals held that the DEA agents seized respondent when they grabbed him by the arm and moved him back onto the sidewalk. The Government does not challenge that conclusion, and we assume—without deciding—that a stop occurred here. *Our decision, then, turns on whether the agents had a reasonable suspicion that respondent was engaged in wrongdoing when they encountered him on the sidewalk.*

*Sokolow,* 109 S.Ct. at 1585 (citation omitted), *quoted in part in Winston,* 711 F.Supp. at 641. The passage reveals that the language relied on by the district court is inapposite as it rests on an assumption that a Fourth Amendment seizure had occurred.

The district court also suggests that because our decisions in *Brady* and *Lloyd* both noted that the police officers had articulated reasons for suspecting the defendant, those cases lend support for its position that absent such suspicion, drug interdiction officers have no authority to approach and question citizens about their possible involvement with drugs. *Winston,* 711 F.Supp. at 642. The court reads too much into those cases. In both *Brady* and *Lloyd,* we expressly concluded that the questioning did not implicate the Fourth Amendment and declined to address the issue of whether the officers had reasonable suspicion. *See Brady,* 842 F.2d at 1314–15 & n. 4; *Lloyd,* 868 F.2d at 450–51.

■ Whatever question may have existed at the time the district court wrote its opinion, it has been put to rest by our decision in *United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989). In that case, which also involved the initiation of an interview by members of a drug enforcement team, the government conceded that the police lacked articulable suspicion when they accosted the defendant. *Id.* at 386. We nevertheless held that no seizure had occurred and affirmed the defendant's conviction for drug possession. *Id.* at 386–87.

Thus *Baskin* makes it clear that the Fourth Amendment is not necessarily implicated when a police officer initiates an encounter with a citizen he has no articulable reason to suspect of a crime.

█ The district court nevertheless suggests that *because* the initial contact was the first step in a routine developed by the Drug Interdiction Unit for application to individuals whose appearance or actions aroused suspicion, the mere *initiation* of the routine implicated the Fourth Amendment and must therefore "be supported by some minimal level of suspicion." 711 F.Supp. at 642. There is simply no basis for this proposition. To the contrary, *Carrasquillo* and *Baskin* both involved encounters initiated by drug enforcement officers as the first step in the scenario described by the court. In *Carrasquillo*, we noted that it was "perfectly lawful for the agents to approach the defendant on the train and ask him if he was willing to answer some questions, *whether or not* the agents had reasonable suspicion," 877 F.2d at 76 (emphasis added); and as we have just pointed out, in *Baskin*, the agent had no grounds for suspicion when he first approached the defendant.

█ Therefore, the only issue with respect to the initial contact is whether, at the time he first approached and spoke to Winston, Beard so conducted himself that a reasonable, law-abiding person in Winston's position would not have felt free to walk away. As no such showing was made, we hold that the district court erred as a matter of law in concluding that Detective Beard's initiation of the encounter with Winston implicated the Fourth Amendment.

█ The district court also held, in the alternative, that a seizure occurred when, in the course of his questioning of Winston, Beard "identified himself as a member of the Narcotics Branch whose purpose it was to stop drugs from coming into Washington, stood in front of defendant with Agent Sorrento positioned behind defendant, and asked to search defendant's bag." 711 F.Supp. at 643. Based on these facts, the court concluded that

[a] reasonable person would have sensed the momentum of the questioning and the maneuvers of the officers, and would have felt the *in terrorem* effect of Detective Beard's identification of himself as a narcotics officer and his request to search the bag *after* defendant had denied possession of drugs.

*Id.* (emphasis in original). While this statement might well describe the likely impact of the officers' conduct on someone who had reason to be apprehensive, we question whether it applies to a citizen who is innocent of crime. We find it by no means clear that a reasonable person unburdened by guilt would have sensed the movements of any officer other than the one who was questioning him; and while the "momentum" of the questions might well have caused a law-abiding person to have felt indignation at being asked for permission to search his bag after he had denied possession of drugs, it is not self-evident that he would have been so intimidated by the questioning that he would have felt his liberty had been restrained.

On examining the record, we do not find circumstances (and the district court's factual findings point to none) that would have caused a reasonable person to feel he was not free to leave. Only two officers were involved, both of them in plain clothes. Their weapons were concealed, and at no time did they physically or verbally threaten, or intimidate, or even touch the defendant before his arrest. No one has suggested that Beard acted other than politely when he identified himself and asked permission to speak with Winston. He did not retain Winston's bus ticket. Prior to the arrest, neither officer restricted Winston's movement in any way or blocked his path. In fact, there is no evidence that Winston was even aware of Sorrento's presence before the arrest. Throughout the encounter, Winston was cooperative and did not ask to leave. And although the hour was late, the time of the encounter was dictated by nothing more sinister than the time of his bus's arrival in Washington.

In sum, we see little to distinguish the circumstances of this case from those of a number of others arising from drug interdiction interviews in which this court has found that no seizure had occurred. *See, e.g., Baskin,* 886 F.2d at 384–87; *Carrasquillo,* 877 F.2d at 74–76; *Lloyd,* 868 F.2d at 448–51; *Brady,* 842 F.2d at 1314–15. Although in each of these cases we affirmed the district court's disposition, we did so as a matter of law. *Cf. Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877 (finding of "seizure" is "a matter of law") (opinion of Stewart, J.). We must therefore reverse the district court because the evidence does not support its conclusion that the defendant was seized as a matter of law.

■ Finally, the district court held that the government failed to establish the validity of Winston's consent to the search of his bag. As this conclusion was based solely on the court's finding that a seizure had occurred before the search, it does not survive our holding that no seizure occurred. *See Winston,* 711 F.Supp. at 643. Even if it did, we can find nothing in the record to contradict the prosecution's showing that the consent "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). Accordingly, we hold the district court's conclusion that the consent was invalid to be clearly erroneous. *See Lloyd,* 868 F.2d at 451 (factual finding of consent is subject to clearly erroneous standard).

### III. Conclusion

We are sensitive to the district court's concern that the "magnitude and seriousness" of the drug crisis "must not undermine constitutional protections." *Winston,* 711 F.Supp. at 643. We are also aware that the seizure test has been criticized as "artificial" because it is based on the supposedly false assumption that ordinary citizens actually believe they are free to walk away from police officers. *See, e.g.,* Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins,* 79 J.Crim.L. & Criminol. 437, 439 (1988); *United States v. Cordell,* 723 F.2d 1283, 1286 (7th Cir. 1983) (Swygert, J., concurring) (asserting that as a factual psychological matter, people stopped for questioning by narcotics agents do not feel free to leave).

The well-established test, however, is not whether a person interviewed by the police would find himself psychologically compelled to cooperate with an officer's requests, but whether such a person would reasonably conclude, as a consequence of the officer's show of authority and other relevant circumstances, that he was not at liberty to leave. The rule this court has formulated for determining whether a seizure occurs within the meaning of the Fourth Amendment is solidly based on Supreme Court teaching, and we believe that it strikes an appropriate balance between the protections against abuse of authority provided by the Fourth Amendment and the legitimate investigative needs of law enforcement officials.

Upon applying the test in this case, we conclude that the questioning of Winston was not a seizure and that he validly consented to the search of his bag. Accordingly, we reverse the order of the district court granting the motion to suppress and remand for proceedings consistent with this opinion.

So ordered.