The **UNITED STATES of America**

v.

**Gavin R. ST. KITTS.**

**No. CR–90–52E.**

United States District Court,
W.D. New York.

Aug. 23, 1990.

Asst. U.S. Atty., Thomas S. Duszkiewicz Buffalo, N.Y., for government.

Robert J. Riordan, Kenmore, N.Y., for defendant.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

This is one of several recent federal prosecutions in this Court involving a motion to suppress evidence recovered during an ongoing interdiction operation by the federal

Drug Enforcement Administration ("DEA") at the interstate bus terminal in downtown Buffalo, N.Y.[1] *See also United States v. Murguia–Rodriguez,* unpublished opinion, CR–89–219A (W.D.N.Y. July 11, 1990) (motion denied); *U.S. v. Montilla,* 733 F.Supp. 579 (motion granted), *reconsideration denied,* 739 F.Supp. 143 (W.D.N.Y. 1990), *appeal pending,* No. 90–1446 (2d Cir.); *United States v. Ramos,* unpublished opinion, CR–89–166A (W.D.N.Y. April 23, 1990) (motion granted); *United States v. Anderson,* unpublished opinion, CR–89–210E (W.D.N.Y. April 6, 1990) (plea taken prior to resolution of the motion).[2]

The abovenamed individual ("the defendant") is charged in a one-count Indictment with unlawful possession of cocaine with the intent to distribute the same—*see* 21 U.S.C. § 841(a)(1)—and has presently challenged the lawfulness of his encounter with federal agents at the bus terminal. A suppression hearing was held June 18, 1990, at which testimony was received from DEA Special Agent Bruce R. Johnson and Senior Border Patrol Agent Daniel F. Allman of the Immigration and Naturalization Service ("INS"). The defendant did not testify. Argument on the motion was heard the same day and the matter was taken under advisement July 13, 1990, upon receipt of all submissions by counsel needed to decide the motion.[3]

According to Johnson's and Allman's testimony at the hearing,[4] on the morning of March 21, 1990 they were in the bus terminal awaiting the arrival of the daily Greyhound morning express bus from New York City. Both agents were plainclothed. They saw the defendant disembark from the bus carrying a gray shoulder bag, re-trieve a blue nylon bag from under the bus and then head for the Greyhound ticket counter. Johnson testified that the defendant was looking around "nervously" during this time but not enough to excite his interest. Allman was near the ticket counter and listened to detect if two "Hispanic-looking" individuals in line behind the defendant spoke with an accent. While so positioned, Allman heard the defendant speak to the ticket agent with what Allman regarded to be a West Indies accent.

After the defendant had left the ticket counter, Allman followed him for a short distance inside the terminal, displayed his identification, asked if he could pose some questions and, the defendant having stopped and agreed, asked him about his citizenship. The defendant said that he was a citizen of Guyana and was in this country on business. He said he had no passport or immigration document on his person, however, so Allman requested that the defendant accompany him to an office in the terminal to verify his immigration status. Johnson went along to the office as well. At this point, Allman acknowledged that, although the defendant was not "under arrest" and had not been told that he was being detained, he was nevertheless not free to leave. Both agents noticed that the defendant had become increasingly nervous and that he had made clicking noises when he spoke.

Inside the office, Johnson identified himself to the defendant and asked if he could search his two bags. The defendant replied "OK." Johnson unzipped the blue bag and, while rummaging through it, Allman again asked for any immigration pa-

---

**1.** The operation also targets Buffalo's International Airport and its railroad station.

**2.** The interdiction operation has also involved Border Patrol agents of the Immigration and Naturalization Service, but it seems that the primary purpose behind the operation is intercepting drugs rather than maintaining the integrity of the borders.

**3.** The government's letter brief was received by this Court June 20, 1990. *See* Letter from Assistant United States Attorney Thomas S. Duszkiewicz (dated June 18, 1990). Thereafter, de-fense counsel informed the Court, by letter received July 13th, that no brief would be supplied on the defendant's behalf. *See* Letter of Robert J. Riordan, Esq. to this Court (dated July 11, 1990). The motion is deemed to have been taken under advisement on the date of receipt of defense counsel's letter.

**4.** The parties did not commission a written transcript of the hearing. Hence, this Court's discussion of the testimony received during the hearing is based on the audiotaped record. *See also* Affidavit of Daniel F. Allman (sworn to March 21, 1990).

pers the defendant might have. The defendant replied that he had a letter concerning a drug arrest in New York City in 1987. He produced an envelope from one of the bags, the contents of which envelope included an immigration document permitting him to remain in the United States through November 27, 1987. The defendant admitted to Allman that he had never obtained any extension of the departure date. Allman placed a telephone call to Border Patrol officials and received a response which, he said, confirmed the defendant's illegal immigration status and his prior arrest (for marijuana possession at the John F. Kennedy International Airport in October 1987). Allman then arrested the defendant, but did not read him his so-called "*Miranda* rights"[5] at such point, however.

Johnson's search of the bags continued in the meantime. Ultimately, in a concealed compartment within the gray shoulder bag, he discovered two bags containing a white powder which he suspected was cocaine. Without field-testing the powder, Johnson also placed the defendant under arrest. Allman then informed the defendant of his rights, which he read from a prepared card. *See* Government Exhibit 1 (copy of card).[6] The defendant responded that he understood these rights. There is no indication from the agents' testimony that he had expressly waived such rights, however.

Subsequently, Johnson performed a field test of the powder and received a positive indication for cocaine. The defendant was then transported to the federal courthouse and, enroute, told the agents that he had been given the shoulder bag by an unidentified person in New York City for delivery to another unidentified person in Cincinnati.[7] He admitted, however, that the clothes in the bag were his.

■ In evaluating the constitutionality of the defendant's encounter with agents Allman and Johnson, the first question to be addressed concerns the point in time at which the defendant was first detained and, thereby, at which the Fourth Amendment first became implicated. A "seizure" of a person within the contemplation of the Constitution may occur (even in the absence of an arrest) upon his simply being questioned by law enforcement agents, but " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.' " *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (*quoting from United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart J., plurality opinion, joined in pertinent part only by Rehnquist J.)); *see also INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (White, J., plurality opinion); *e.g., U.S. v. Winston,* 892 F.2d 112, 115–117 (D.C.Cir. 1989).[8] Here, it is manifest (and Allman

---

**5.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** The card is evidently printed on both sides, one side in English, the other in Spanish. It is unclear from the agents' testimony whether both sides were read or only one side (and, in the latter event, which side was read). The English version is as follows:

"Before we ask you any questions, you must understand your rights:

"• You have the right to remain silent.

"• Anything you say can be used against you in court, or in any immigration or administrative proceeding.

"• You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questions.

"• If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

"• If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.

"• You also have the right to stop answering at any time until you talk to a lawyer."

**7.** Allman's affidavit (*see* footnote 4 hereinabove) represents that the delivery locale was Columbus, but only Johnson offered testimony on this point at the hearing, so there is an unexplained, albeit insignificant, discrepancy in the accounts of events in such regard.

**8.** The motion to suppress in *U.S. v. Winston* had been granted by the district court, 711 F.Supp. 639 (D.D.C.), but such determination was reversed on appeal. 892 F.2d 112 (D.C.Cir.1989).

conceded at the hearing) that, once the defendant had been asked to accompany Allman to the office inside the terminal for purposes of verifying the defendant's immigration status, the defendant was at the point not free to leave and was therefore detained or "seized" within the meaning of the Fourth Amendment. What is less clear is whether a reasonable person in the defendant's place would have felt unfree to disregard Allman's inquiries even before such time.

In view of all of the circumstances, this Court concludes that a reasonable person would have felt that he might freely disregard and walk away from Allman's initial request to question him. " [T]he presence of [an] officer as a figure of governmental authority does not, by itself, constitute the "show of authority" necessary to make a reasonable person feel unfree to leave.' " *U.S. v. Winston, supra,* at 116 (*quoting from Gomez v. Turner,* 672 F.2d 134, 142 (D.C.Cir.1982)). And there is nothing in this case aside from Allman's display of his credentials to the defendant which would suggest that there was a coercive environment at the very outset of their encounter.[9]

■ Inasmuch as this Court finds that the Fourth Amendment had not been implicated before the point of Allman's requesting the defendant to accompany him to the office to verify his immigration status, at which point the defendant was "seized,"

the constitutional sufficiency of Allman's suspicions regarding the defendant must therefore be evaluated only as of such moment. It is evident that Allman had at that point in time sufficient suspicion to detain the defendant. A brief investigatory detention of an individual is constitutionally permissible "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *U.S. v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *see also INS v. Delgado, supra* (upholding "factory surveys" in search of illegal aliens based upon a reasonable individualized suspicion); *United States v. Brignoni–Ponce,* 422 U.S. 873, 874, 95 S.Ct. 2574, 2577, 45 L.Ed.2d 607 (1975) (allowing roving patrol stops of vehicles reasonably suspected of harboring illegal aliens). Here, Allman admitted on cross-examination that the only factor which had initially prompted him to single out the defendant for questioning was that the defendant had spoken with what he considered to be a West Indies accent. Such does not " 'raise the complex of conduct to a level justifying reasonable suspicion of criminal activity.' " *See United States v. Buenaventura–Ariza,* 615 F.2d 29, 36 & fn. 11 (2d Cir.1980). Yet, by incorporating additional factors which later became known to Allman, after he had begun questioning the defendant but before he had requested that he accompany him to the office, the result differs.[10] All-

---

On remand, the defendant was ordered held without bond pending trial. He then moved for revocation of the detention, which motion was denied by the trial court and on appeal. 896 F.2d 1383 (D.C.Cir.1990). A petition to the United States Supreme Court for a writ of certiorari was filed May 18, 1990. No. 89–7540.

**9.** This Court's conclusion that the defendant was not initially detained is by no means a confident one, however, because only the agents' accounts have been made available for consideration and they, not surprisingly, have characterized the initial encounter with the defendant in connotative terms suggestive of a completely non-obligatory conversation on a par with a request for directions or for a cigarette light. Yet it is also true that, while the burden rests upon the government to demonstrate non-violation of the defendant's constitutional rights, the defendant could have testified at the hearing. If he had, this Court would perhaps have had a better

factual picture of the events. Likewise, there is no contemporaneous recording of the conversations. However, no inference of a coercive environment can possibly be drawn from the evidence which was actually adduced at the hearing.

**10.** It is essential for conceptual clarity (and thereby for correct conclusions) in cases such as this to keep plain what the agent knew *and when he knew it.* Otherwise, *improper factors may inadvertently come into play in the analysis.*

For example, in *United States v. Murguia–Rodriquez, supra,* another case deriving from agent Allman's questioning of individuals at the bus terminal, the Court assumed for purpose of its discussion that Allman's questioning of the defendant amounted to a detention of him from the very outset—*see id.,* at p. 4 fn. 1—and determined that reasonable suspicion was present to permit such detention. *Id.,* at pp. 4–5. But the

man learned from the instant defendant that he was a citizen of another country and that he was without documentation of current valid immigration status. This was enough to justify a reasonable suspicion on Allman's part that the defendant was in this country illegally. Such sufficed for seizure or detention and, once this suspicion had been confirmed by Allman's telephone call, he had probable cause to arrest the defendant.

██ Finally, it is plain that both the defendant's consent to a search of his two bags by agent Johnson and his statements made under interrogation following the recital of his *Miranda* rights were proffered knowingly and voluntarily, and thus that these statements and the contents of the bags properly will be admissible into evidence against him.[11] As above discussed, Johnson had identified himself to the defendant and had asked to be permitted to search his bags and the defendant had said that he could. There is no indication whatsoever that the defendant's will was overborne or that he lacked the education or intelligence necessary to understand what a search of the bags would entail and that thereby his consent was involuntary or unknowing. *See Schneckloth v. Busta-monte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Similarly, the defendant's affirmative response to a contemporaneous question regarding whether he had understood his recited rights satisfies the government's burden of showing that the defendant had knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed

counsel. *See Tague v. Louisiana,* 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (*per curiam*); *North Carolina v. Butler,* 441 U.S. 369, 372–373, 99 S.Ct. 1755, 1756–57, 60 L.Ed.2d 286 (1979). Although the defendant never expressly waived his rights, he tacitly did so by his continued answering of the agents' questions in light of his understanding. Again, there is nothing before this Court which would tend to show that the defendant had been coerced or confused.[12]

Accordingly, it is hereby ORDERED that the defendant's motion to suppress is denied.

only factors known to Allman in that case at the outset were that defendant's accent and the departure point of the bus on which he had been travelling. The Court relied on these factors *and* also on certain others that were not known to Allman until he had already detained and begun his questioning of the defendant. To the extent these additional factors were taken into account, given the Court's assumption of a detention from the outset, the reasonable suspicion standard seemingly was misapplied. When such additional factors are not taken into account, it becomes clear that Allman had in that case lacked reasonable suspicion at the outset.

11. Had the defendant's detainment been on the other hand found to be illegal, his consent to the

search and to his continued interrogation would have been tainted and therefore invalid. *See Florida v. Royer, supra,* at 507–508, 103 S.Ct. at 1329–30.

12. It appears from the agents' testimony that the *Miranda* rights were read to the defendant only after he was arrested for the second time. Allman had arrested him but not recited the rights and then, after discovering illicit drugs in one of the defendant's bags, Johnson had also arrested him. Only thereafter did Allman read the rights. Nevertheless, there is no indication that the defendant was asked or answered any questions in the brief interim.