UNITED STATES of America, Appellee

v.

Donald Erik WOOD, Appellant.

No. 92–3007.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1992.

Decided Dec. 29, 1992.

Mary E. Davis, on brief and Thomas Abbenante, Washington, DC (appointed by the court), for appellant.

James Stephen Arisman, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Roy W. McLeese, III, and Mary Patrice Brown, Washington, DC, Asst. U.S. Attys., were on the brief, for appellee.

Before: EDWARDS, WILLIAMS and HENDERSON, Circuit Judges.

Concurring opinion filed by Circuit Judge HENDERSON.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

On August 1, 1991, the appellant, Donald Wood, was charged in a two-count indictment with (1) unlawful receipt of a firearm while under indictment in violation of 18 U.S.C. § 922(n) (1988) and (2) possession of a prohibited weapon in violation of D.C.Code § 22–3214(a) (1989). Prior to his arrest on July 14, 1991, the appellant was followed into the entrance hallway of an apartment building by a police officer who was in full uniform and armed. Acting with no articulable suspicion, the officer ordered the appellant to "halt right there," "stop." The appellant, in response, froze in his tracks and a weapon dropped to the floor between his feet. The officer then drew his gun, grabbed the appellant and held him against the wall. The weapon that had fallen between the appellant's legs was recovered; the appellant was subsequently advised of his *Miranda* rights and taken to a police station. On November 5, 1991, at a hearing before the trial judge, the appellant moved to suppress statements that he had made and the weapon that had been recovered at the time of his seizure. This motion was denied. Following a jury trial, the appellant was convicted on both counts. The appellant now appeals from the denial of the motion to suppress.

On the record before us, we hold that Wood was illegally seized and that the gun was recovered directly as a result of that illegality. Therefore, the appellant's motion to suppress should have been granted. Accordingly, we reverse.

## I. BACKGROUND

The events giving rise to this case occurred at about 9:00 p.m. on July 14, 1991, at 17th and Q Streets, Southeast, in the District of Columbia. Officer Thomas Webb of the Metropolitan Police Department was assigned to the area, working in conjunction with members of the Neighborhood Watch program who were on patrol that evening. As Officer Webb, in full uniform and armed, approached 1608 17th Street, he saw Donald Wood walking away from a group of nine or ten men towards an apartment building at 1606 17th Street.

Webb was about twelve feet away from Wood; he noticed that the appellant was "cradling his arms" across his mid-section, but he could not see anything bulging from the appellant's jacket. As the appellant walked away, he looked back at another officer, Charles Brevard, who was following the appellant to his right side. Neither Officer Webb nor Officer Brevard claimed to have any "articulable suspicion" when the appellant walked away from the group of men with whom he had been associating that night.

Wood walked from the group of men into an apartment building at 1606 17th Street, with Webb following immediately behind him. One of the building doors was tied open; the entranceway was largely dark, with the only light in the hallway coming from outside. Just inside the entrance, there were doorways to the left and right, and a staircase directly ahead. Wood attempted to enter the first apartment to the left. Officer Webb, standing directly behind Wood, ordered him to "halt right there," "stop." The appellant froze in his tracks; a dark heavy object then fell from the area of Wood's waist and dropped between his feet. While drawing his gun, Webb grabbed Wood by the front of his neck and held him up against the wall. Officer Brevard entered the building, and Webb told him that he believed a gun was on the floor between Wood's feet. Brevard told Webb, "you'd better let him down;" Webb then released Wood and the appellant fell to the ground. The officers handcuffed the appellant, then recovered a TEC–9 semi-automatic pistol that had fallen between Wood's legs. The appellant told the officers, "that's not mine; I was just carrying it." Wood neither made any gesture nor said anything to threaten or resist the officers. Following his seizure, Wood was advised of his *Miranda* rights and taken to a police station for post-arrest processing.

The appellant was indicted on August 1, 1991. Subsequently, on November 5, 1991, he appeared before the District Court and moved to suppress the statements that he had made and the weapon that had been

recovered during his encounter with the police on July 14, 1991. After a hearing on the matter, the trial judge rendered a decision from the bench denying the motion to suppress, as follows:

> I see no reason not to credit fully the police officers' testimony. It is another escalating street scene in which I find nothing constitutionally impermissible about what occurred that led to the seizure of the gun.

> I might say I would have reached that conclusion before looking at the case of California versus Hodari, H–O–D–A–R–I, D., 111 Supreme Court 1547. But that legal conclusion is reinforced by that case.

A jury trial commenced on November 6, 1991, and on November 8, 1991, Wood was convicted on both counts. On January 8, 1992, Wood filed this appeal.

## II. ANALYSIS

The Government concedes that, until Donald Wood dropped his gun, Officer Webb had no reasonable articulable suspicion to justify a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20–27, 88 S.Ct. 1868, 1879–1883, 20 L.Ed.2d 889 (1968). Therefore, only two issues must be resolved on appeal: (1) whether Wood was seized before he dropped the gun; and, (2) assuming Wood was seized, whether dropping the gun was an independent act that somehow dissipated the taint of the seizure. We hold that Donald Wood was seized before he dropped his gun, and that he dropped the gun directly as a result of the seizure.

### A. The Illegal Seizure

■ The Fourth Amendment's "protection against 'unreasonable ... seizures' extends to seizures of the person, as well as seizures of property." *United States v. Jordan*, 951 F.2d 1278, 1281 (D.C.Cir.1991). It is also well understood that an individual may be unlawfully seized if restrained either by "physical force or show of authority." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. The question whether an individual has been "seized" raises a legal issue which we review *de novo*. *Jordan*, 951

F.2d at 1281; *United States v. Maragh*, 894 F.2d 415, 417–18 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).

In considering whether there has been a seizure in a situation, as here, where there is an absence of physical force, we are guided by the Supreme Court's decision in *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In *Hodari D.*, the defendant fled at the approach of a police car. An officer, who was wearing a jacket marked "Police," gave chase using a circuitous route to cut-off the defendant. Looking behind him as he ran away, the defendant did not turn and see the officer until the officer was almost upon him, whereupon the defendant tossed away what later proved to be crack cocaine. A moment later the officer tackled the defendant, handcuffed him and called for assistance. Before the Court, the defendant argued that he had been "seized" at the time when he tossed the drugs, so the drugs were the fruit of that seizure and should have been excluded from evidence. Justice Scalia, writing for the majority, rendered the following opinion:

> The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

> *       *       *       *       *       *

> An arrest requires *either* physical force ... or, where that is absent, *submission* to the assertion of authority.

> *       *       *       *       *       *

> We do not think it desirable, even as a policy matter, to stretch the Fourth Amendment beyond its words and beyond the meaning of arrest, as respondent urges. Street pursuits always place the public at some risk, and compliance with police orders to stop should therefore be encouraged. Only a few of those orders, we must presume, will be without adequate basis, and since the addressee has no ready means of identifying the deficient ones it almost invariably is the

responsible course to comply. Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. *Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine, successful seizures.*

Respondent contends that his position is sustained by the so-called *Mendenhall* test, formulated by Justice Stewart's opinion in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), and adopted by the Court in later cases. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S., at 554, 100 S.Ct., at 1877.... In seeking to rely upon that test here, respondent fails to read it carefully. It says that a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary,* but not a *sufficient* condition for seizure—or, more precisely, for seizure effected through a "show of authority." *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.

\*   \*   \*   \*   \*   \*

In sum, assuming that [the officer's] pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

*Id.,* —— U.S. at —— – ——, 111 S.Ct. at 1550–52 (citations omitted) (emphasis added).

■ *Hodari D.* makes it clear that, even when a "reasonable person" would have believed that he was not "free to leave" pursuant to an officer's injunction to stop, a defendant may not rely on such a "show of authority" to exclude evidence if he failed to *submit* to the officer's assertion of authority. Thus, pursuant to the Court's judgment in *Hodari D.,* we must determine (1) whether Officer Webb used a "show of authority" to seize the appellant and (2) whether the appellant *submitted* to the assertion of authority.

### 1. The "Show of Authority"

A defendant is subjected to a show of authority "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). More specifically, "a court must consider all the circumstances surrounding the encounter to determine whether the *police conduct* would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991) (emphasis added); *accord Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988) (dispositive inquiry is whether a reasonable person would have felt free to "disregard the police presence and go about his business.").

■ Thus, as the Court emphasized in *Hodari D.,* the test for whether a "show of authority" was made is objective, and looks to the totality of the circumstances. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. Specific factors considered include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's "use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled." *Id.; see also United States v. Jordan,* 958 F.2d 1085,

1086–87 (D.C.Cir.1992); *United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir.1990).

■ On the record before us, there can be little doubt over the fact that Wood was subjected to a "show of authority." Officers Webb and Brevard, armed and in full uniform, followed Wood, at night, into a dark apartment building. Webb, positioning himself directly behind Wood, ordered him to "halt right there," "stop." When Officer Webb told Wood to stop, he was not extending a greeting or positing a question; rather, he was giving an order in "language ... indicating that compliance ... might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. In Webb's three accounts of what transpired, he explained how he commanded Wood to stop: (1) "As he was facing the door, I said 'stop.' " Transcript of Trial (Nov. 6, 1991) at 84 ("Trial Tr."); (2) "I told him to stop." Transcript of Motion to Suppress (Nov. 5, 1991) at 10 ("Motions Tr."); and (3) "I told him to stop—'halt right there.' " *Id.* at 18–19. As Justice Scalia said in *Hodari D.*, "policemen do not command 'Stop!' expecting to be ignored." —— U.S. at ——, 111 S.Ct. at 1551.

Moreover, Officer Webb's positioning at the moment he gave the order significantly restricted Donald Wood's movements. Webb was so close to Wood when he told him to stop that, by Webb's own admission, Wood had "nowhere to go." Trial Tr. at 84. A reasonable person could not possibly feel free to ignore a direct order to stop given by a police officer, in uniform and armed, standing directly behind him.

This case is unlike *Mendenhall* and its progeny. It is undisputed that police officers do not violate the Fourth Amendment by merely approaching individuals in public or by asking questions. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality). Here, however, there are no elements of a consensual, "benign police/citizen encounter." *Jordan*, 958 F.2d at 1087 (no seizure found where the "police were dressed in plainclothes; their weapons were hidden; they spoke in conversational tones; and they did not physically block [defendant's] path");

*see also United States v. Jones*, 973 F.2d 928, 930 (D.C.Cir.1992) (no seizure found where "officer wore plain clothes, identified himself, did not show his weapon" and did not block defendant's exit); *Maragh*, 894 F.2d at 418 (no seizure found where "one plainclothes police officer, who approached [defendant] in mid-afternoon, in a public place, displayed no weapons, and did not block [defendant's] path"). Not surprisingly, the Government does not claim that Webb's encounter with Wood was consensual or benign.

In sum, the record establishes that Officer Webb made a clear show of authority when he told Wood to "halt right there," "stop;" the record also plainly supports the conclusion that a reasonable person in Wood's position would not have felt free to disregard Officer Webb's order. Thus, we hold that Wood was subjected to a show of authority.

### 2. Submission to the "Show of Authority"

■ To satisfy the second prong of *Hodari D.*, the court must determine whether Wood's actions constituted a *"submission to the assertion of authority."* —— U.S. at ——, 111 S.Ct. at 1551. The Government argues that Wood's dropping of the pistol was tantamount to fleeing, since it was an attempt to hide the incriminating evidence and thereby resist authority. This is a specious argument and we reject it.

Unlike the defendant in *Hodari D.*, Wood did not flee from the police officers. Webb first confronted Wood as the appellant attempted to enter a doorway in the apartment building. Upon Webb's order to stop, Wood froze in his tracks and immediately dropped the weapon between his feet. We cannot imagine a more submissive response to a police officer's order to "halt right there." Wood did not try to escape into the nearby apartment, or struggle past the officer, or otherwise ignore the officer's order, or turn the weapon on the officer—rather, he rendered himself helpless in the face of a show of authority.

Furthermore, the Government's argument that Wood was trying to "hide" in-

criminating evidence is truly absurd. For one thing, Officer Webb testified that the gun fell to the floor with a "loud thud," Motions Tr. at 10, hardly an indication that Wood was trying to conceal the weapon. For another thing, no reasonable person in Wood's position would have believed that the gun would go undiscovered at his feet. Rather, Wood's act of standing in place and dropping his weapon can be viewed only as a submission to a show of authority.

### B. The Government's Causal Link Theory

[6] The Government's final argument is that the appellant's discarding the gun was wholly independent of any police seizure of his person. On this point, the Government, citing *People v. Boodle,* 47 N.Y.2d 398, 418 N.Y.S.2d 352, 356, 391 N.E.2d 1329, 1332, *cert. denied,* 444 U.S. 969, 100 S.Ct. 461, 62 L.Ed.2d 383 (1979), claims that where, upon seizure, a suspect's attempt to discard a weapon involves a "calculated risk" rather than a "spontaneous reaction to a sudden and unexpected confrontation with the police," the seized weapon is not the product of the unlawful seizure.[1] Even were we to accept the arguably dubious reasoning of *Boodle,* we would still reject the Government's contentions. In this case, the dispositive point is that the prosecution has not come close to satisfying its conceded burden of proof that Wood's dropping of the weapon was some sort of independent effort to get rid of the gun.

It is well established that "[u]nless an intervening event or other attenuating circumstance purges the taint of the initial illegality, evidence discovered during an illegal seizure must be suppressed." *Jordan,* 958 F.2d at 1089. Evidence obtained as the result of an illegal seizure is inadmissible if "come at by exploitation of that illegality." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). However, evidence re-

covered "by means sufficiently distinguishable to be purged of the primary taint" is admissible. *Id.* (citation omitted). Once an illegal seizure is established, the Government has the burden of proving that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality. *See Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975) (prosecution has burden of proving that confession was not obtained through the exploitation of an illegal arrest); *cf. United States v. Brady,* 842 F.2d 1313, 1315–16 (D.C.Cir.1988) (prosecution has burden of proving that defendant intended to *voluntarily* abandon seized drugs).

In this case, the Government failed entirely to meet its burden of proving that Wood's act was independent of the illegal seizure. Immediately after Officer Webb told Wood to stop, the appellant dropped the gun between his feet. Unlike the defendant in *Boodle,* for example, Wood did not attempt to hide the gun on his person and then throw it out of the car window on the way to the police station. In any event, the main point is that the Government presented no evidence which showed that "an intervening event or other attenuating circumstance purge[d] the taint of the initial illegality." *Jordan,* 958 F.2d at 1089. No time elapsed and no intervening events occurred between the commencement of the seizure and the dropping of the gun. Therefore, we find a direct nexus between the illegal seizure and the recovery of the weapon.

### III. CONCLUSION

The District Court erred in denying appellant's motion to suppress. We therefore reverse his conviction and remand the case to the District Court.

*So Ordered.*

---

1. In *Boodle,* the defendant was illegally seized when a police officer asked him to get into his patrol car to answer some questions. During the drive to the station, Boodle threw a gun out the car window. The court reasoned that the taint of the illegal seizure was dissipated because the defendant did not rid himself of his weapon as a response "directly to the illegal police action." *Id.,* 418 N.Y.S.2d at 356, 391 N.E.2d at 1332. The court found that "the defendant's attempt to discard the revolver was an independent act involving a calculated risk." *Id.* The court concluded that Boodle's independent act broke the causal link between the illegality and the recovery of the weapon, so the evidence was held admissible.

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

Because the Government failed to argue that Officer Webb had a reasonable articulable suspicion when he stopped Donald Wood, I must reluctantly concur in the result. I write separately to explain that reasonable suspicion *did* exist and to emphasize that a seizure requiring probable cause is not effected *merely* because a police officer tells a citizen to stop.

Although the majority's recounting of the facts is generally accurate, it has omitted some facts and minimized others, presenting a somewhat skewed picture of the incident. Initially, Officer Brevard drove by the group that included Wood, turned around and got out of his car. Both Officer Brevard and Officer Webb, who was walking on the sidewalk toward Wood, noticed Wood walk quickly away from the group. As Wood was heading toward the apartment building at 1606 17th Street, S.E., he was looking over his shoulder at Officer Brevard. Despite the hot weather that evening, Wood wore a long-sleeved, dark navy-blue top jacket. As Wood hurried toward the apartment building, he had his arms cradled across his midsection as if he were carrying or hiding something beneath his jacket. Approximately three to five seconds elapsed from the time Wood left the group until he entered the building. With his gun holstered, Officer Webb followed Wood into the building. Officer Brevard was a few steps behind him. When Officer Webb saw Wood try to enter an apartment on the left, he told Wood to stop. There is no evidence in the record as to the tone of Officer Webb's voice. After Officer Webb told Wood to stop, a dark heavy object, which turned out to be a TEC–9 machine gun, fell from Wood's waist to the ground between his feet. Officer Webb, reacting to the "loud thud," drew his gun and grabbed Wood. According to Officer Webb's testimony, no more than ten to fifteen seconds elapsed from the time he entered the apartment building until the gun fell.

Contrary to the majority's statement, the Government did not *concede* that these facts did not raise a reasonable articulable suspicion sufficient to support a *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For whatever reason, the Government simply did not contend that there was articulable suspicion. Appellee Br. at 14. Because of this failure, we are foreclosed from determining what, to me, manifestly occurred, that is, a *Terry* stop based on reasonable articulable suspicion. *See United States v. Pavelski,* 789 F.2d 485, 490 (7th Cir.), *cert. denied,* 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986).

When "evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' " *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). "[I]nnocent behavior will frequently provide the basis for a showing of" reasonable suspicion. *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). Moreover, the incident must "be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976).

In my view, reasonable articulable suspicion existed. Wood walked quickly away from the group (toward obvious sanctuary) and was looking back at Officer Brevard. *See United States v. Campbell,* 843 F.2d 1089, 1094–95 (8th Cir.1988) (walking quickly and looking over shoulder three times factors); *United States v. Espinosa,* 827 F.2d 604, 608 (9th Cir.1987) (walking away at fast pace a factor), *cert. denied,* 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988). He had his arms cradled across his body as if he were carrying or hiding something beneath his jacket—a jacket he was wearing even though it was a hot summer evening. *See Campbell,* 843 F.2d at 1094–95 (wearing winter coat in middle of summer a factor); *cf. United States v. Abokhai,* 829 F.2d 666, 668 (8th Cir.1987) (wearing light jackets in winter suspicious behavior), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1082, 99 L.Ed.2d 241 (1988). It also bears emphasis

that this incident occurred in a high crime area as evidenced by the fact that the officers on duty that evening were working with a neighborhood watch group and the National Guard. *United States v. Stanley,* 915 F.2d 54, 56 (1st Cir.1990) (characteristics of area in which encounter occurred a relevant factor); *United States v. McFadden,* 722 F.Supp. 807, 809 (D.D.C.1989) (knowledge that area is high drug-trafficking neighborhood a factor).

As numerous courts have recognized, there are three categories of lawful police encounters with the public: (1) consensual encounters that fall outside the fourth amendment, (2) *Terry*-type detentions that require reasonable articulable suspicion, and (3) arrests that require probable cause. *See United States v. Diggs,* 522 F.2d 1310, 1326 (D.C.Cir.1975) (Justice, J., dissenting), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *United States v. Watson,* 953 F.2d 895, 897 n. 1 (5th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992); *United States v. Morgan,* 936 F.2d 1561, 1566 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992); *United States v. High,* 921 F.2d 112, 115 (7th Cir.1990); *United States v. Espinosa–Guerra,* 805 F.2d 1502, 1506 (11th Cir.1986). Because of the Government's position in this case, we are forced to characterize the stop as either a consensual encounter or an arrest. It would be near impossible to conclude that Officer Webb's and Officer Brevard's encounter with Wood was consensual in view of the totality of the circumstances. *See United States v. Lewis,* 921 F.2d 1294, 1297 (D.C.Cir.1990) (relevant factors to determine whether seizure occurred include time of day, place, tone of voice, displaying weapon, in uniform). Officers Webb and Brevard wore uniforms and their weapons, although holstered, were visible. The encounter took place at night in a dark location and the officers were positioned so that Wood's movement was restricted in the apartment entranceway. *See id.* at 1298–99 ("location relevant but far from decisive," especially where constraints caused by factors independent of police

conduct). Finally, Officer Webb told Wood to stop.

Because this incident cannot be categorized as a *Terry* stop or a consensual encounter, we are left with no choice but to conclude that an arrest occurred. At the time Wood submitted to Officer Webb's show of authority, no probable cause existed. Probable cause did not exist until the gun fell from Wood's midsection.

I believe that the majority opinion should not be read to imply that whenever a police officer tells a person to stop, he needs probable cause. It is only because of the Government's litigating position that we are forced to conclude that probable cause was required to support the seizure. But simply saying "stop" does not turn an otherwise unobjectionable *Terry* stop into an arrest requiring probable cause.