# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 16, 2006          Decided June 22, 2007

No. 05-3080

UNITED STATES OF AMERICA,
APPELLEE

v.

MELVIN M. GODDARD,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00214-01)

*Jon S. Pascale*, appointed by the court, argued the cause and filed the briefs for appellant.

*Youli Lee*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Thomas J. Tourish, Jr.*, and *Lisa H. Schertler*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Dissenting opinion filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* TATEL.

PER CURIAM:  Charged with unlawful possession of a firearm by a convicted felon, appellant moved to suppress the gun and his statement that he owned the gun, claiming that the arresting officers lacked reasonable suspicion to stop him.  The district court denied his motion, ruling that the officers had reasonable suspicion at the time of the stop.  We conclude that the stop happened later than the district court found, but because the record supports reasonable suspicion at that later point, we affirm.

## I.

On the evening of March 30, 2004, four Metropolitan Police Department officers in an unmarked police car received a radio lookout about an attempted unauthorized use of a vehicle (UUV).  The radioing officer had tried to stop the suspect's car, but the suspect fled the scene.  The lookout described the suspect as a black male, 5'8" in height, weighing 180 pounds, and dressed in a black coat and blue jeans.

Two blocks from the attempted UUV, at 7:25 p.m.—just minutes after the lookout—the four officers saw four black men talking to each other outside a gas station.  Tr. of June 21, 2004 Hr'g at 16–17, 21.  The district court found that all four men, one of whom was Appellant Melvin Goddard, were wearing black coats and blue jeans and that there was a substantial difference in their heights.  *United States v. Goddard*, No. 04-214, slip op. at 2 (D.D.C. Dec. 18, 2006) (hereinafter "Supplemental Findings"); Tr. of June 21, 2004 Hr'g at 83.  Only two were close to 5'8" (one was 5'6" and the other between 5'6" and six feet), while Goddard and Vaughn Walker,

a defense witness, were both over six feet tall. According to one of the officers, the four men "for the most part" matched the lookout "as far as the clothes thing, height and weight." Tr. of June 21, 2004 Hr'g at 17. The same officer later clarified that despite his uncertainty about the consistency of the men's heights with the lookout description, he decided to approach them based on "the clothes worn by the defendant and the other three gentlemen." *Id.* at 21–22.

The officers pulled into the gas station, fifteen to twenty feet away from the group of men. All four officers wore plain clothes, jackets with an MPD logo, and badges. Their guns and handcuffs were showing, but the guns were not drawn. Once the officers pulled into the gas station, Walker began moving away from the group. As the officers exited their car, Goddard "held the right side of his waistband, like he was holding . . . a gun." *Id.* at 8. Approaching the group of men, one of the officers overheard Goddard say he had a gun, whereupon the officer shouted "gun." Although Walker's testimony was less than clear as to the sequence of events, the district court, contrary to the dissent's characterization, *see* Dissenting Op. at 7–8, found that Walker was still moving away from the group of men at the time the officer shouted "gun," Tr. of June 21, 2004 Hr'g at 81, 84–85 (making this finding shortly after its announcement that "[t]he court will make the following findings of fact," and not, as the dissent suggests, in a separate summary of Walker's testimony, *see* Dissenting Op. at 7–8). Walker testified that the officers told him to return, at which point he "turned back around" and was pulled aside by one of the officers. *Id.* at 59–60. Two of the officers then handcuffed Goddard and conducted a pat-down, finding a gun in his waistband. At that point, the officers placed Goddard under arrest. After his arrest but before he received a *Miranda* warning, Goddard explained that he was carrying the gun because he had just gotten out of jail and had been shot recently.

4

A grand jury indicted Goddard for possession of a firearm by a convicted felon. 18 U.S.C. § 922(g)(1). Arguing that the officers lacked reasonable suspicion for the stop, Goddard moved to suppress the gun and his admission that he owned it. Although believing it "a close case as to whether these facts meet the *Terry* standard," Tr. of June 21, 2004 Hr'g at 81, the district court nonetheless found that the officers had reasonable suspicion to stop Goddard. The court based its conclusion on two primary circumstances: that the stop occurred two blocks from and soon after the attempted UUV; and that the men loosely matched the suspect's description, given that all four wore blue jeans and black coats and at least one was close to the suspect's height.

After the court denied his motion to suppress, Goddard pleaded guilty, reserving the right to raise the suppression issue on appeal. Following oral argument, we remanded the record to the district court for supplemental findings as to "the sequence of events surrounding appellant's stop and seizure, the factors establishing when the police contact became a stop, and the facts known to the police officers at those points." *United States v. Goddard*, No. 05-3080 (D.C. Cir. Nov. 9, 2006). In its supplemental memorandum, the district court made the following finding: "In this case, the [officers'] 'contact' became a 'stop' as soon as the police officers drove up to the gas station . . . to investigate whether the four African-American men they saw standing and talking included the [attempted UUV suspect]." Supplemental Findings at 2.

**II.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV.

As an exception to the Fourth Amendment's warrant requirement, officers may conduct a brief investigative "*Terry* stop" so long as they have "reasonable, articulable suspicion" of criminal conduct. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). *Terry* stops require only that officers have a "minimal level of objective justification," *INS v. Delgado*, 466 U.S. 210, 217 (1984)—a standard significantly lower than the probable cause required for a warrant.

In this case, we face two distinct issues: when the stop occurred and whether the officers had reasonable suspicion at that time. Both are questions of law that we consider de novo. *United States v. Maragh*, 894 F.2d 415, 417 (D.C. Cir. 1990) ("[T]he [Supreme] Court has never deferred to the trier of fact regarding the question of seizure."); *United States v. Christian*, 187 F.3d 663, 666 (D.C. Cir. 1999) (applying de novo review to district court's determination of reasonable suspicion).

As to the first issue, a stop takes place "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," *Terry*, 392 U.S. at 19 n.16, or, put differently, "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (alteration in original) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). "[T]he test must not be what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *Gomez v. Turner*, 672 F.2d 134, 140 (D.C. Cir. 1982) (quoting *Coates v. United States*, 413 F.2d 371, 373 (D.C. Cir. 1969)). Under this test, neither the subjective impressions of the defendant nor the subjective intentions of the officer determine whether a seizure has occurred. *See id.* at 143

("[T]he intent of the officer or the reason behind his decision to approach a pedestrian cannot be the basis upon which we determine whether a seizure has occurred."). In deciding whether a stop has occurred, this circuit has cited the factors listed by Justice Stewart in *United States v. Mendenhall*: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554; *Gomez*, 672 F.2d at 144. In addition, we consider "the demeanor of the approaching officer," *Gomez*, 672 F.2d at 144, "whether the officer . . . wore a uniform," and "the time and place of the encounter," *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992). Of course, not all interactions between police and citizens are stops, as "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place." *Florida v. Royer*, 460 U.S. 491, 497 (1983); *see also United States v. Nurse*, 916 F.2d 20, 23 (D.C. Cir. 1990).

We disagree with the district court that the stop happened "as soon as the police officers drove up to the gas station." Supplemental Findings at 2. By itself, the presence of a police car is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave. For example, in *Michigan v. Chesternut*, 486 U.S. 567 (1988), where four officers in a police cruiser accelerated to catch up with a running pedestrian and drove parallel to him for a short while, the Supreme Court explained that although the presence of a police car might be "somewhat intimidating," such police presence does not constitute a seizure where the officers did not use their siren or flashers, did not command the defendant to stop, did not display their weapons, and did not drive aggressively to block or control the defendant's movement. *Id.* at 569, 575. Similarly, in *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000), we found

that no seizure had occurred where police officers drove their unmarked car into a parking lot twenty-five feet away from the defendant's car. *Id.* at 1317. Here, when the officers drove their unmarked police car into the gas station, the car was fifteen to twenty feet away from the group of men, and nothing in the record indicates that the officers drove aggressively or impeded Goddard's movement. Moreover, the fact that the car halted in the gas station's entrance way does not suggest that a reasonable, innocent *pedestrian* would have felt unfree to leave.

Nor did the stop occur when the police exited their car and began to approach Goddard and the other three men. Admittedly, some of the circumstances are suggestive of a stop, including that four officers were present—all with guns and handcuffs showing and wearing identifiable MPD jackets and badges—and that the officers "jumped out" of the car. Tr. of June 21, 2004 Hr'g at 58. But the presence of multiple officers does not automatically mean that a stop has occurred. *See Chesternut*, 486 U.S. at 575 (finding no seizure where police car with four officers followed defendant); *see also United States v. Tavolacci*, 895 F.2d 1423, 1424–25 (D.C. Cir. 1990) (finding no seizure where at most two officers were in defendant's view). Our cases, moreover, allow police officers to make a contact—to approach individuals and interact with them—without reasonable suspicion. *See, e.g.*, *Nurse*, 916 F.2d at 23 (finding no stop where officer who identified himself as a police officer approached and questioned defendant at a taxi stand); *United States v. Winston*, 892 F.2d 112, 114, 117 (D.C. Cir. 1989) (finding no seizure where officer who identified himself as a police officer approached and asked to speak with defendant outside of bus station). As we have explained:

> [T]he presence of the officer as a figure of governmental authority does not, by itself, constitute the "show of authority" necessary to

> make a reasonable person feel unfree to leave.
> There must be some additional conduct by the
> officer to overcome the presumption that a
> reasonable person is willing to cooperate with a
> law enforcement officer. The approach and
> direction of a question by a police officer cannot
> be, as a matter of fact or of law, a seizure of the
> person so approached.

*Gomez*, 672 F.2d at 142 (footnote omitted). Thus, the fact that the officers wore MPD gear, including guns and handcuffs, does not mean that a stop occurred. *See United States v. Samuels*, 938 F.2d 210, 213–14 (D.C. Cir. 1991) ("Although the visibility of handcuffs, like the display of a uniform, a badge, or a gun, is relevant to whether an encounter with police constitutes a seizure, the passive display of handcuffs, by itself, is not a sufficient show of authority to cause a reasonable, law-abiding person to believe his liberty is being restrained." (citations omitted)). Contrary to the dissent's suggestion, we think Walker's characterization of the officers as "jump[ing] out" of the car, even coupled with the car's presence in the entrance way, an insufficient show of authority to constitute a stop. *See* Dissenting Op. at 6–7, 12–13.

Of course, we can imagine additional circumstances that might have made a reasonable person in Goddard's position feel unfree to leave, such as if the police had run aggressively towards him. *See Gomez*, 672 F.2d at 144 (listing officer's demeanor as a factor in determining whether a stop had occurred). But because Goddard made no such showing, we need not decide whether such circumstances would produce a different result. *See, e.g.*, *Winston*, 892 F.2d at 117 (holding that where "no . . . showing was made" that officer's action would make "reasonable, law-abiding person in [defendant's] position" feel unfree to walk away, district court erred in finding Fourth

Amendment violation); *Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006) (finding no seizure where defendant failed to show that officers restrained his liberty).

Based on the record before us, the stop occurred when one of the officers yelled "gun" and told Walker to return to the group. We have no doubt that a reasonable person would feel unfree to leave upon hearing officers seven or eight feet away yell "gun"—a statement sure to arouse the concern of all officers and civilians in the immediate area—and order one of his companions to return. *See Wood*, 981 F.2d at 540 (finding stop where officer ordered defendant to stop); *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996) (finding seizure where officer ordered defendant's coworker to "freeze" when individuals "were only five feet apart and . . . obviously working together").

Nor do we have any doubt that by this point—and this is the second issue we must address—the officers had reasonable suspicion to stop Goddard. Reasonable suspicion requires that, based on the totality of the circumstances, an officer have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Here, the officers had plenty of reason to suspect Goddard had a weapon, which Goddard himself concedes would justify a stop. Oral Arg. at 7:58; *see* D.C. CODE § 22-4504 (2001) (prohibiting carrying weapons in D.C. without a license). After "[holding] the right side of his waistband, like he was holding . . . a gun," Tr. of June 21, 2004 Hr'g at 8; *see United States v. Brown*, 334 F.3d 1161, 1167 (D.C. Cir. 2003) (holding that furtive movements in response to police presence may create reasonable suspicion), Goddard declared he had a gun, giving the officers ample grounds for the *Terry* stop.

Thus, because the officers had reasonable suspicion at the time of the stop, we affirm Goddard's conviction.

*So ordered.*

BROWN, *Circuit Judge*, dissenting: In America, people who are peaceably and lawfully minding their own business (or who seem to be) have the right to be free from arbitrary police interference. That is the explicit premise of *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (recognizing the right of every person to be free from unreasonable governmental restraint, interference, or intrusion). Forty years later, *Terry*'s evolution raises troubling questions. In the crime-plagued, violence-prone, drug-ridden reality of our urban centers, is reasonable suspicion too high a threshold; is it too much to ask?

I

The facts, in brief, are as follows. Police were pursuing a motor vehicle. The driver pulled over and immediately fled on foot in the dark. Police caught only a fleeting glimpse of the suspect: a black man, average height and build, wearing blue jeans and a dark jacket or coat. Not much to go on in a largely black neighborhood, but police broadcast a "lookout" giving the description. They reported the man's height as 5'8" or 5'10", and his weight as 180 to 190 pounds. About five blocks away, Officer Israel James and three other officers were patrolling in an unmarked Crown Victoria, a car well-known in the area as a police car. When they heard the report of a black man fleeing, they drove closer to the site.

Two blocks from where the suspect had fled, the officers spotted four black men—ranging in height from 5'6" to 6'4"—conversing peaceably in front of a gas station, at least one of them wearing a black coat.[1] These were neighborhood

---

[1] The testimony regarding the clothes the men were wearing is quite unhelpful. Officer James testified that their clothes "[f]or the most part" matched the description in the broadcast, Tr. of June 21, 2004 Hr'g at 17, adding that appellant (who is over six feet tall) was wearing a "[b]lack coat and blue jeans," *id.* at 49. At one point, the trial judge describes the men as wearing "jeans and a dark shirt," *id.*

residents, who quickly recognized the police car, and one of the men, Vaughan Walker, wanted nothing to do with the police, though he was not involved in any criminal activity. Even before the police stopped, Walker began walking away—but he didn't get far. The police pulled their car part way into the gas station, blocking the entrance, and all four officers "automatically jumped out," Tr. of June 21, 2004 Hr'g at 58, wearing jackets bearing the "MPD" logo, holstered weapons, and handcuffs. One of the officers told Mr. Walker to stop; the statement was directed at Mr. Walker, but the message to the others, including appellant, was clear enough. No one attempted to flee. As Officer Figgeroa approached appellant, appellant said, "I have a gun," or words to that effect. Officer Figgeroa immediately yelled out "gun," alerting the other officers, who restrained appellant without difficulty and then lifted his shirt, revealing a handgun tucked into his pants. However, the officer who had earlier broadcast the "lookout" could not identify appellant as the fleeing suspect.

Appellant was arrested, and charged with unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the physical evidence and his statements, claiming an illegal stop in violation of his Fourth Amendment rights. The district court held a suppression hearing and denied the motion. The court's analysis makes clear that, in the court's view, a *Terry* stop occurred as soon as the officers arrived on the scene. But the court concluded the officers had sufficient grounds for a stop and frisk based on the broadcast description of the fleeing suspect. Appellant then pled guilty, preserving his right to appeal the Fourth Amendment issue.

---

at 83; at another point, "blue jeans and a dark jacket," *id.* at 86. In neither case is the court's statement supported by specific testimony.

We heard argument in appellant's appeal on October 16, 2006, and on November 9, 2006, we remanded the record to the district court, asking the court to clarify the exact "sequence of events surrounding appellant's stop and seizure, the factors establishing when the police contact became a stop, and the facts known to the police officers at those points." *United States v. Goddard*, No. 05-3080 (D.C. Cir. Nov. 9, 2006). The district court responded with an express finding that the *Terry* stop occurred "as soon as the police officers drove up to the gas station at 2830 Sherman Avenue to investigate." *United States v. Goddard*, No. 04-214, slip. op. at 2 (D.D.C. Dec. 18, 2006).

II

Before *Terry*, warrantless seizures were deemed reasonable only if based on probable cause. *Terry* carved out a narrow exception to the probable cause requirement, allowing police officers to make limited intrusions if the officer reasonably suspects criminal activity is afoot or public safety is at risk. Thus, before a police officer initiates an investigative stop, the officer must, based on an assessment of the whole picture, "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18 (1981). The Court adopted a two-part inquiry for evaluating the reasonableness of an investigative stop involving something less than probable cause: (1) Was the officer's action justified at its inception? and (2) Was it reasonably related in scope to the circumstances that justified it in the first place. *Terry*, 392 U.S. at 20-21; *United States v. Sharpe*, 470 U.S. 675, 682 (1985).

It is true, of course, that as a standard "reasonable suspicion" is necessarily imprecise. But no matter how low the bar is set, generic racial descriptions devoid of distinctive individualized details cannot, without more, provide police

adequate justification for a *Terry* stop. It is not enough to share the same racial characteristics as a suspect and be in the vicinity.

The "lookout" broadcast at issue here described only a black male, 5'8" to 5'10" in height, about 180 to 190 pounds, wearing a black jacket or coat and blue jeans. The broadcast went out after nightfall, and the officer broadcasting the description made clear the suspect had fled before officers got a good look at him. Therefore, the arresting officers were on notice that the description might be unreliable, a point which they readily acknowledged. At best, one can speak only in the most approximate terms about the height and weight of a man seen running away in the dark, and in those circumstances, any dark-colored coat or jacket might appear to be black. In any case, the officers were definitely not looking for four young men, ranging in height from 5'6" to 6'4", conversing peaceably in front of a gas station. The police can articulate no basis for targeting these men except they were black, they were casually clothed, and they were in the general vicinity of the fleeing suspect. The officers conceded that none of these men seemed agitated, nor did any show signs of recent physical exertion, such as labored breathing or sweating. Apparently, a "lookout" broadcast encompassing virtually any casually dressed black man in the vicinity made all black males fair game. Such a generic description should never be a sufficient basis for a *Terry* stop.

Though the cases in this circuit are very deferential to the police, as is appropriate, none stands on as thin a record as this one. Our cases establish, as they should, the general rule that when a police officer decides to initiate a *Terry* stop based solely on a third-party description, that description needs to be specific enough to differentiate the suspect from other people who are in the vicinity. Hence, in a case involving a black fugitive in a predominantly black neighborhood, the officer must

have something more to go on than race, gender, and standard street-clothes. *See United States v. Davis,* 235 F.3d 584 (D.C. Cir. 2000); *United States v. Smart,* 98 F.3d 1379 (D.C. Cir. 1996); *United States v. Simpson*, 992 F.2d 1224 (D.C. Cir. 1993). That rule is not satisfied in our case, where the facts are extreme enough to debase the rule and considerably extend our holding in *Davis*.

## III

### A

The majority argues the *Terry* stop did not occur here until after appellant admitted he had a gun. Usually, of course, a *Terry* stop occurs only when police actually physically restrain a person or make some verbal statement indicating the person is not free to leave. A verbal statement, however, is not the only way to communicate that message; a "show of authority" can also effect a detention. *Terry*, 392 U.S. at 19 n.16. In the latter case, the applicable standard "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

Here, as noted, the district court made a determination that the *Terry* stop occurred "as soon as the police officers drove up to the gas station." In other words, in the district court's view, the circumstances at that moment were such that a reasonable person would not have felt free to leave. Generally, we accept the district court's findings of fact as true unless clearly erroneous, but the question of when a person is seized for Fourth Amendment purposes is a mixed question of fact and law. The historical facts are subject to the clearly erroneous standard of review, *Ornelas v. United States*, 517 U.S. 690, 699 (1996), but the ultimate conclusion as to whether the facts constitute a Fourth Amendment seizure is a legal question, *id.* In some cases, however, the district court's factual findings present only a general sketch, and other findings remain implicit in the court's ultimate conclusion. For this reason, we must "give due weight to inferences drawn from [the findings] by resident judges." *Id.* Therefore, it does not suffice in this case for us to consider only the court's express findings; we must also consider the entire record, reading the evidence in a way that favors the court's conclusion as to when the seizure occurred.

B

According to the record before us, four officers pulled up in a car known in the neighborhood to be a police car. They brought the car only part way into the gas station, parking so as to block the entrance, and all four officers jumped out, wearing clothing marked "MPD" and bearing visible weapons. Walker testified he had seen police officers "jump out" of the same car on numerous prior occasions. Tr. of June 21, 2004 Hr'g at 57. His use of the slang expression "jump out" conveys his impression that these four officers did not calmly exit the vehicle in order to ask a few questions. Rather, Walker's phrasing indicates a coordinated police action—or, to put the

point in street terms, a bust was going down. This was not a casual contact, and these men were not free to walk away.

The fact that Walker tried to leave and the police instructed him to return only confirms this conclusion. *See United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996) (ordering a person to "freeze" effects a seizure of a nearby associate). Walker testified that he began to walk away while the police were still in the car, Tr. of June 21, 2004 Hr'g at 67-68, and he did not get very far before being told to stop, *id.* at 69-70. Also, the sequence of Walker's narrative indicates police told him to stop *before* they confronted appellant. *Id.* at 58-64. The most natural conclusion, then, is that the police told Walker to stop as they were emerging from the car or immediately thereafter.

Contrary to the majority's assertion, *see* maj. op. at 3, the record contains no explicit finding by the district court that Officer Figgeroa had already yelled "gun" when police instructed Walker to stop and return. The court does state that, at the time Officer Figgeroa yelled "gun," Walker was "walking away" with "his back towards" the others, Tr. of June 21, 2004 Hr'g at 84, but the court may have been referring to the fact that, *after* police told Walker to return, they then instructed him to go over "[t]owards the rail, in between the pay phone and the air pump," *id.* at 60-61. Moreover, in the passage the majority references, the district court was not making a finding but only summarizing Walker's testimony. The court introduced this passage by stating that Officer James's testimony "was corroborated by the *testimony* of Mr. Walker." *Id.* at 84 (emphasis added). The court then expressly referred to "notes" the court had taken of Walker's testimony and, in that context, made the comment the majority calls a finding. *Id.* Significantly, the court's notes of Walker's testimony were apparently inaccurate, for Walker never actually stated that the

gun was found *while* he was walking away. *See id.* at 68-69. In short, the court's asserted "finding" is ambiguous at best, and in any case, the record contains no evidence to support it.

In addition, the fact that appellant blurted out that he had a gun evidences his subjective impression that the police were going to search him, and the officers confirmed that they did not stop merely to ask these individuals what, if anything, they might have seen. Rather, Officer Israel James testified that the purpose in stopping was "to attempt to determine whether or not . . . one of the individuals was the one who actually fled the scene." *Id.* at 7. The subjective intent of the police officer is perhaps not determinative in this context, *Mendenhall*, 446 U.S. at 554 n.6, but it does tend to support the district court's conclusion that the police conveyed the message, through their actions and demeanor, that no one was free to leave. Thus, I find the evidence easily supports the court's ultimate conclusion as to when the seizure occurred.

True, the district court concluded the seizure occurred "as soon as the police officers drove up," whereas it more accurately occurred when the police drove up, jumped out, and told Walker not to leave, but the court's statement can reasonably be taken in a general sense. The court's meaning was only that the seizure did not occur later, when appellant admitted to having a gun. This interpretation of the court's statement is consistent with the court's application of *Terry*, in which the court focused solely on events as they existed prior to appellant's admission.

IV

Not all encounters with police implicate the Fourth Amendment; rather, different police-citizen interactions trigger different standards. Consensual encounters are entirely outside the scope of the Amendment. Investigative

detentions—commonly known as *Terry* stops—must be supported by reasonable suspicion of criminal activity. Custodial arrests require probable cause.

*Terry* was a sensible decision. It recognized that armed and dangerous offenders present a serious threat to the safety of both the police and the public, and it allowed a greater role for street savvy and police judgment. The holding in *Terry* permits police officers to take reasonable steps, based on their experience and expert training, to prevent a crime before it occurs and to maintain safety, justifying their actions with only a "reasonable, articulable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (characterizing *Terry*'s holding). But *Terry* was never intended to upend completely the warrant and probable cause requirements, and it does so if the lower courts give police a free hand to search whenever there is the coincidence of a black man's recent flight from the police and another black man's presence in the vicinity. This lax standard perverts the core requirement that police have a "particularized and objective basis for suspecting the particular person . . . of criminal activity." *Cortez*, 449 U.S. at 417-18.

I have already stated my view that the stop in this case occurred when the police jumped out of their vehicle and told Walker not to leave. This case, however, illuminates a broader issue. The majority's analytic approach turns almost entirely on the question of when the stop occurred. Having identified the stop ("when one of the officers yelled 'gun,'" maj. op. at 9), everything preceding it passes out of the analysis, comprehended under the familiar axiom that officers are free "to make a contact—to approach individuals and interact with them—without reasonable suspicion." *Id.* at 7. But *Terry* "emphatically reject[s]" a logic that would "isolate from constitutional scrutiny the initial stages of the contact between the policeman and the citizen." 392 U.S. at 16-17. Rather,

*Terry* limits "the initiation," as well as "the scope," of investigative detentions. *Id.* at 17. In my view, truly consensual conversation ("Have you seen this man?") in which police are on equal terms with ordinary citizens is very different from a confrontation in which police target a particular person because they suspect him to be the criminal described in a police broadcast. It makes sense for the Fourth Amendment not to regulate casual conversation between police and citizens. But how could the Fourth Amendment stay dormant when police confront someone because they suspect him to be a criminal? Targeted police investigation activates the Amendment. In the instant case, the confrontation *began* as an investigative stop; the police claimed a particularized suspicion about four specific men—a claim that could not conceivably be supported by the objective information available. Not even the majority claims the initial investigation was justified. Rather, the majority employs an analytic approach that makes justifying the confrontation constitutionally unnecessary. This is certainly consistent with the trend of recent cases applying *Terry*, but I think it is an error. When police focus their investigative attention on someone and choose to confront that person, they must have a constitutionally adequate reason for doing so. Nothing in *Terry* suggests that the police can employ arbitrary criteria to select their targets and then artificially create the circumstances that justify application of the *Terry* exception.

*Terry* itself acknowledged the unacceptable social cost of Fourth Amendment violations, discussing "police-community tensions in the crowded centers of our Nation's cities" and the "wholesale harassment by certain elements of the police community" of minorities, "particularly Negroes." *Id.* at 12, 14. There are two specific aspects to this social problem. First, inappropriate use of *Terry* in America's minority neighborhoods offends the principle of equal justice under law. For, as we all know, courts would not approve the search of four men in

business attire, conversing peaceably in front of a Starbucks, if the only basis for the search was a "lookout" broadcast specifying a white man, medium height and build, wearing a business suit. Second, excessive *Terry* searches set poor black communities and the police on opposing sides of pitched battle. At a minimum, these perpetual intrusions leave young black men feeling bruised and insulted. Often enough, the anger leads to confrontations with the police, sometimes with violent or lethal consequences. As *Terry* put it, when police officers use stop-and-frisk tactics against minorities to "maintain the power image" of the officers, the aim is "sometimes accomplished by humiliating anyone who attempts to undermine police control of the streets." *Id*. at 15 n.11 (citation and internal quotation marks omitted). Is the even-handed application of the *Terry* standard too much to ask?

The facts of this case lead me to wonder if *Terry*'s prudent constraints on police conduct have been forgotten in our frustration over city life plagued with drug trafficking and violent crime. As a result, what we are now tempted to enforce is not *Terry* but the rule that, in a high-crime neighborhood, being young, male, and black creates reasonable, articulable suspicion. *See* David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 IND. L.J. 659 (1994). Here, four men were stopped. There was no constitutionally adequate justification for the initial confrontation. Three of them were innocent of criminal activity, but nevertheless faced the indignity of being placed against a rail and searched. Vaughan Walker testified he started walking away as soon as he saw the police car because he "didn't feel like being harassed." The lesson of today's decision is clear: he has no choice.

When the ostensibly neutral principles set forth in *Terry* are thus applied, what was created to be a carefully outlined

exception to the Fourth Amendment's warrant and probable cause requirements is transformed into a general warrant—a police license to search out crime by playing the odds, relying on hunch, intuition, street smarts, and stereotypes. The odds are good, although the crimes charged are too often unrelated to the "suspicion" that led to the stop. After all, in the instant case, a search of four almost randomly selected black men in a high-crime neighborhood turned up one with a gun—a 25% success rate. The instances where a search discloses no criminal activity are brushed aside and forgotten—except in the neighborhoods where the sense of unfairness and frustration festers and swells and then seeps out in little acts of defiance or mindless eruptions of rage.

Acknowledging that no opinion "can comprehend the protean variety of the street encounter," the *Terry* court left intact the courts' "traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires." 392 U.S. at 15. If this court is ever going to draw such a line, this is the case in which to draw it.

V

I am not advocating here a broad new rule of constitutional law that will inhibit police. Police are free to contact members of the public without every contact being construed as a seizure. *See, e.g.*, *United States v. Nurse*, 916 F.2d 20, 23 (D.C. Cir. 1990). Moreover, the presence of two or more officers does not, by itself, transform a contact into a seizure. *See, e.g.*, *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). The case before us presents very specific circumstances: The police targeted these men in response to a specific broadcast about a fleeing suspect. They pulled part way into the gas station,

blocking the entrance; four officers jumped from the car at once, wearing clothing marked "MPD"; and they immediately told someone who was attempting to leave to return. That is not how one would expect police to proceed when they are merely making inquiries, and it is very different from the facts of cases in which police did no more than make their presence felt. *See, e.g.*, *Chesternut*, 486 U.S. at 569, 575; *United States v. Johnson*, 212 F.3d 1313, 1317 (D.C. Cir. 2000). Most important, we have here a finding by the district court that the police conduct would have communicated to a reasonable person at the scene that he or she was not free to leave, and the best interpretation of the evidence in the record reasonably supports that legal conclusion.

We should adopt the district court's finding that the *Terry* stop occurred when four police officers pulled into the entrance of the gas station, sprang simultaneously from their car, and instructed Walker not to leave. We should then reject the court's legal conclusion that the generic description of a medium-sized black man fleeing justifies the *Terry* stop that occurred here. By the district court's logic, police would have been able to stop virtually every casually dressed black man within a sixteen-block radius of the crime. Because the meager facts available to the officers did not come close to justifying the initial contact, the fruit they subsequently shook out of the poisonous tree should be excluded. Is that too much to ask? It is what the constitution requires; it is just enough.

Accordingly, I respectfully dissent.

TATEL, *Circuit Judge*, concurring: I share many of the dissent's concerns about how courts have applied *Terry* in high-crime minority communities, *see* Dissenting Op. at 10–12, and would welcome an opportunity to explore those concerns in depth. This case, however, cannot provide that opportunity because the problems so well articulated by the dissent flow directly from a series of Supreme Court and D.C. Circuit decisions that bind this panel and, as the dissent acknowledges, determine the outcome of the issues before us. *See* Dissenting Op. at 10 (characterizing majority's approach as "consistent with the trend of recent cases applying *Terry*"). Specifically:

(1) The stop did not occur when the police exited their car. *See Michigan v. Chesternut*, 486 U.S. 567, 569, 575 (1988) (finding no seizure where police car with four officers pursued defendant); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding that officers may approach an individual in public without effecting a seizure); *United States v. Samuels*, 938 F.2d 210, 213–14 (D.C. Cir. 1991) (noting that mere visibility of officer's handcuffs, uniform, badge, or gun is an insufficient show of authority for a seizure); *United States v. Gomez*, 672 F.2d 134, 142 (D.C. Cir. 1982) ("There must be some additional conduct by the officer [beyond the fact of his presence] to overcome the presumption that a reasonable person is willing to cooperate with a law enforcement officer."); Maj. Op. at 6–8. If the stop had occurred when the police exited their car, I would agree with the dissent that the police lacked reasonable suspicion. *See* Dissenting Op. at 4–5.

(2) The stop instead occurred when one of the officers yelled "gun" and told Walker to return to the group. *See United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir.1992) (finding sufficient show of authority for a stop where officer ordered defendant to stop); *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 292 (10th Cir. 1996) (finding seizure of defendant

where officer told defendant's companion to freeze); Maj. Op. at 9.

(3) At that point—when the officer yelled "gun"—the police had reasonable suspicion to stop Goddard. *See* D.C. CODE § 22-4504 (2001) (requiring a license to carry a handgun); *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (holding that reasonable suspicion exists where an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity"); *United States v. Brown*, 334 F.3d 1161, 1167 (D.C. Cir. 2003) ("It is well settled that an individual's furtive movements may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and search."); Maj Op. at 9.